In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 08-3798 & 08-3852

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

*v.*

ENTERPRISE TRUST COMPANY,
JOHN H. LOHMEIER, and
REBECCA A. TOWNSEND,

*Defendants*.

APPEALS OF:

DONALD DECHRISTOPHER,
MARTHA DECHRISTOPHER,
and DAVID S. COCHRAN

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 1260—**James B. Zagel**, *Judge*.

ARGUED FEBRUARY 12, 2009—DECIDED MARCH 18, 2009

Before EASTERBROOK, *Chief Judge*, and FLAUM and
MANION, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.  Enterprise Trust Company
opened for business in 2006 and closed about two years

later when the district court froze its assets in re-
sponse to a complaint by the Securities and Exchange
Commission. During its short life, Enterprise managed
more than $100 million in almost 1,200 accounts. Some of
its customers used Enterprise only for custodial services
(that is, to hold securities that the customers had pur-
chased), while others relied on Enterprise to select securi-
ties. John H. Lohmeier, Enterprise's principal manager,
did not honor customers' instructions. He purchased
options, engaged in short sales, and made other risky
trades in managed accounts that were supposed to be
invested conservatively. If these lost money, Lohmeier
played double-or-nothing with customers' capital. Stock-
brokers demanded additional collateral, which Lohmeier
supplied by using the assets in custodial accounts (need-
less to say, without those investors' knowledge). By the
time the SEC stepped in, Lohmeier had managed to lose
more than half of the money entrusted to Enterprise.

At the SEC's request, the district court appointed a
receiver, who proposed a plan for distributing Enterprise's
remaining assets. The receiver concluded that, as of
June 30, 2008, Enterprise held approximately $23 million
in liquid securities, $5 million in cash, and $9 million in
real estate and illiquid securities, while investors' claims
exceeded $100 million. He proposed to distribute these
assets so that the custodial investors would receive ap-
proximately 60% of their original capital, while investors
who permitted Enterprise to exercise some control over
their assets would receive less (between 25% and 50%).
These estimates precede the decline of the stock market
since the plan's date; actual payouts will be lower. The

plan values real estate and illiquid securities at acquisition cost, so the discount for these assets will be especially steep. Illiquid assets are predominantly assigned to the owners of managed accounts, which means that as a practical matter their proportionate distribution will be less than the percentages in the plan imply.

Several owners of managed accounts contended that all investors should be treated the same, but the district judge sided with the receiver and approved the plan. 2008 U.S. Dist. LEXIS 79731 (N.D. Ill. Oct. 7, 2008). Three of the protesting investors have appealed. Appellate jurisdiction is the first question. We held in *SEC v. Wozniak*, 33 F.3d 13 (7th Cir. 1994), that investors affected by a receiver's plan of distribution can't appeal without intervening and becoming formal parties to the litigation—and none of these three investors intervened. The receiver accordingly has asked us to dismiss the appeals.

*Wozniak* understood *Marino v. Ortiz*, 484 U.S. 301 (1988), to hold that only parties may appeal. In *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998), affirmed by an equally divided Court under the name *California Public Employees' Retirement System v. Felzen*, 525 U.S. 315 (1999), we extended *Wozniak* to an appeal by a member of a certified class who is dissatisfied by the outcome, holding that a class member must intervene in order to appeal. See also *In re Navigant Consulting, Inc., Securities Litigation*, 275 F.3d 616 (7th Cir. 2001). But *Devlin v. Scardelletti*, 536 U.S. 1 (2002), holds that class members may appeal without becoming parties in their own right, and this calls *Wozniak* into question.

Let us go back to *Marino*, the foundation for *Wozniak*. Police officers who contended that a test for promotion within the ranks had a disparate impact on black and Hispanic employees filed a suit against New York City under Title VII of the Civil Rights Act of 1964. That suit ended with a consent decree providing for additional promotions of black and Hispanic officers. White officers who claimed to be adversely affected by that settlement filed an appeal, but the Supreme Court held that the white officers' failure to become parties prevented them from appealing.

In *Devlin* the Court concluded that *Marino* turned on the fact that the white officers were not bound by the decree; if the settlement made them worse off, they were free to file their own suit and demand relief. Members of a certified class, by contrast, are bound by the suit's outcome. The Court analogized class members to other persons who have been allowed to appeal because a decree effectively resolved their rights. As examples, the Court pointed to bidders at a foreclosure sale, who may appeal from an order confirming the sale. *Blossom v. Milwaukee & Chicago R.R.*, 68 U.S. (1 Wall.) 655 (1864), discussed in *Devlin*, 536 U.S. at 7–8. The Court also mentioned *Hinckley v. Gilman, Clinton & Springfield R.R.*, 94 U.S. 467 (1877), which held that a receiver may appeal from an order fixing the amount of his compensation. And it might have added that a creditor who files a claim in bankruptcy need not intervene as a party in order to appeal from an order rejecting that claim or reducing its amount. See *In re Dykes*, 10 F.3d 184 (3d Cir. 1993); *In re Urban Broadcast Corp.*, 401 F.3d 236 (4th Cir. 2005).

What these situations have in common is that the judicial decision concludes the rights of the affected person, who cannot litigate the issue in some other forum. And that is equally true of persons whose rights to the property marshaled by a receiver are resolved in the receivership proceeding. People whose money was under management at Enterprise Trust Co., like creditors of a debtor in bankruptcy, must accept the distribution that the court believes appropriate. As with an *in rem* proceeding (where a court divvies up stakes in a fixed asset), they can't file another suit seeking more from the pool of assets administered in the receivership (or the bankruptcy). We therefore conclude that *Wozniak* is incompatible with *Devlin* and must be overruled. This eliminates a conflict among the circuits—for other courts permit investors to appeal in receivership proceedings without intervening, and no circuit has followed *Wozniak*. See *SEC v. Forex Asset Management LLC*, 242 F.3d 325 (5th Cir. 2001); *SEC v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 665 (6th Cir. 2001). See also *Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73 (2d Cir. 2006).

The merits are easier than the jurisdictional question. District judges possess discretion to classify claims sensibly in receivership proceedings. See *SEC v. Wang*, 944 F.2d 80, 84–85 (2d Cir. 1991); *SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992); *Forex Asset Management*, 242 F.3d at 331; *Basic Energy*, 273 F.3d at 670–71. The district court did not abuse that discretion when approving the receiver's proposal.

The receiver had three principal reasons to give a preference to the custodial investors: first, they did not authorize Enterprise to change or pledge their assets in any way; second, they were in the dark about the fact that Enterprise had used their assets as collateral (while the investors in managed accounts knew, or could have learned from reading the statements Enterprise sent them, that risky investments had been made in their accounts); third, if Lohmeier's strategy had succeeded, the investors in managed accounts (and Lohmeier himself) would have reaped the gains. Because they had been subjected to involuntary and uncompensated risk, the receiver concluded, the custodial investors deserved a larger cut of the remaining pie (and to be paid in liquid assets to the extent possible).

Appellants reply that they did not authorize Lohmeier to take as much risk as he did—which is true, but the fact remains that they authorized him to make decisions about their investments and stood to gain if the strategy had succeeded, while the custodial investors neither authorized risk-taking nor had any prospect of gaining from those risks. The receiver allocated losses to the investors who could have gained; that's sensible. It would have been better still to match the payouts to the trading gains and losses in particular accounts, but the way Enterprise kept (or did not keep) records made that impossible.

Our appellants say that, if any distinction is allowed, they should be grouped with the custodial investors, or at least with the managed accounts in the 50% class, rather

than with the managed accounts in the 25% class. The receiver put approximately 100 accounts in the 25% payout class. These accounts were distinctive, in the receiver's eyes, because the investors knew that Lohmeier personally would decide how to invest their funds, and all of them gave him carte blanche.

Appellants say that this is not so. David Cochran, one of the three, filed an affidavit stating that he told Lohmeier to manage his account conservatively, because it represented retirement savings. Yet he signed papers directing Lohmeier to manage his account for "maximum growth." Enterprise Trust sent Cochran monthly statements showing short sales and purchases of options, plus margin loans to purchase more stock than the balance of Cochran's investment—magnifying gains if the market moved in the right direction but also magnifying losses if it did not. (The statements falsely minimized the losses that Cochran's account had experienced.) Cochran, a septuagenarian lawyer, asserts that he did not read the statements because his wife had a terminal illness that consumed his mental energy. Yet the facts remain: He authorized Lohmeier to trade freely in quest of "maximum growth," and he ignored actual notice that the investments were anything but conservative. Cochran would have kept the gains had Lohmeier's strategy succeeded; this means that losses likewise must be allocated to him when the strategy failed.

Owners of custodial accounts would have a stronger objection to the plan. The receiver initially planned to pay 100¢ on the dollar to the victims of Lohmeier's theft

(there is no polite word for what he did to the custodial accounts' assets) and decided otherwise only after realizing that this would mean that many investors in managed accounts would receive nothing. The absolute priority rule in bankruptcy means that one class of creditors may be paid in full before junior creditors get anything; a similar approach might have been appropriate here. But none of the custodial investors has appealed.

Appellants say that the district court should have held an evidentiary hearing before ruling on the receiver's plan of distribution. But hearings are required only when material facts are in dispute. What we have just said about Cochran shows that there was no need to resolve a material dispute. (Much the same could be said about the DeChristophers, the other appellants.)

One final dispute needs to be wrapped up. Howrey LLP, which performed legal services for Enterprise Trust, submitted a bill for about $300,000. The receiver recommended that the law firm receive $75,000, which it agreed to accept in satisfaction of the bill. (Neither the law firm nor the receiver was keen to consume the estate's assets by litigation.) The district court approved this distribution. Appellants say that the $75,000 should have gone to the investors. But Howrey, which worked in advance of payment, thus extending credit, is as much an investor in Enterprise Trust as appellants are, and Howrey ended up in the same 25% payout class as appellants did. They have no legitimate beef.

AFFIRMED