In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-4090

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

WEALTH MANAGEMENT LLC, et al.,

*Defendants-Appellees.*

APPEAL OF:

EDWIN WILSON M.D. IRA and the
JAMES P. AND SANDRA J. VERHOEVEN
REVOCABLE TRUST

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 1:09-cv-00506-WCG—**William C. Griesbach**, *Judge.*

ARGUED MAY 26, 2010—DECIDED DECEMBER 1, 2010

Before RIPPLE, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* This is an appeal from a collateral
order issued in an enforcement action brought by the

Securities and Exchange Commission ("SEC") against a Wisconsin-based investment firm and its principals. For more than twenty years, Wealth Management LLC handled client accounts for hundreds of investors. Many were retirees, so Wealth Management usually stuck to traditional safe, low-risk investments. That changed in 2003 when Wealth Management set up six unregistered investment vehicles—similar to hedge funds—and began investing heavily in unconventional and illiquid assets. The six funds failed, and the SEC filed an enforcement action against Wealth Management and two of its principal officers alleging a host of securities-law violations. At the SEC's request, the district court froze Wealth Management's assets and appointed a receiver to perform an accounting and fashion a plan to distribute whatever assets could be recovered.

The receiver faced a daunting task. Of the approximately $131 million Wealth Management had under management, only about $6.3 million was recoverable. The receiver proposed to distribute the diminished assets to investors on a pro rata basis and also imposed a cutoff date after which any redemption distributions would be offset against the investor's total distribution. Certain investors filed objections to the proposed plan. The district court overruled the objections and approved the plan, and two objecting investors have appealed.

After filing their notice of appeal, the objectors asked the district court to stay the receiver's distribution until the resolution of the appeal. The district court denied this request. The objectors brought the stay motion to

this court, and again it was denied. Then, after briefing was completed but prior to oral argument, the receiver went forward with a distribution of about $4 million of the recovered assets. On the heels of this distribution, the receiver moved to dismiss the appeal or summarily affirm because unwinding the distribution would be inequitable to the nonobjecting investors and create administrative difficulties. We said we would take the motion with the merits.

We now affirm. The district court's decision to approve the plan was fair and reasonable and withstands scrutiny under the deferential standard-of-review applicable to decisions of this kind. Where a receivership trust lacks sufficient assets to fully repay investors and the investors' funds are commingled, a distribution plan may properly be guided by the notion that "equality is equity," and pro rata distribution is appropriate. *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). In approving the receiver's proposed plan for distribution, the district court properly considered and rejected the objectors' contrary arguments—in particular, their argument that they were really creditors and not equity holders and therefore entitled to preferential treatment.

## I.  Background

### A.  Wealth Management and its Investors

Wealth Management LLC was a financial-planning firm located in Appleton, Wisconsin. As of May 2009, it managed 447 client accounts and had approximately

$131 million under management. Many of its clients were retirees seeking safe, low-risk investments, so from 1985 until 2003, client assets were held in segregated accounts, separately managed, and typically invested in common instruments such as stocks, bonds, and highly liquid stock and bond funds. In 2003, however, Wealth Management altered this model by establishing six unregistered investment pools that were similar to hedge funds. These six funds, which are relief defendants in the underlying SEC action, are: WML Gryphon Fund LLC ("Gryphon"); WML Watch Stone Partners, L.P. ("Watch Stone"); WML Pantera Partners, L.P. ("Pantera"); WML Palisade Partners, L.P. ("Palisade"); WML L3 LLC ("L3"); and WML Quetzal Partners, L.P. ("Quetzal"). Gryphon was established as a Wisconsin limited-liability company; L3 was a Delaware limited-liability company, and the other four were Delaware limited partnerships. Wealth Management served as general partner or managing member for each of the six funds. Complete authority to select and manage the investments in these funds resided in two Wealth Management officers: James Putman, the firm's founder, Chief Executive Officer, and Chairman; and Simone Fevola, its President and Chief Investment Officer. Of the roughly $131 million under management in 2009, about $102 million was invested in these six funds—the lion's share, approximately $88 million, in Gryphon and Watch Stone.

The offering documents for Gryphon and Watch Stone represented that these funds would invest primarily in "investment grade" debt securities. This made sense given Wealth Management's client base—retirees who

depended on their Wealth Management assets as a primary source of income and therefore required safe, low-risk investments. But this representation was far from the truth. Although Putman and Fevola told clients that the funds were safe and profitable, they were actually investing client assets in risky and illiquid investments—primarily subfunds and other alternative investments such as life-insurance-premium financing funds, real-estate financing funds, and a water park.

Yet Wealth Management's investors thought all was well. Not only did the firm communicate to its clients that their investments were stable and conservative, but it also issued monthly reports suggesting that the new Wealth Management funds were high-performing instruments that were exceeding industry benchmarks. The illusion ended in February 2008 when Wealth Management sent a letter to Gryphon investors saying that there was not enough money to pay redemptions in full and that redemptions would be limited to two percent per quarter of the value of each individual's investment.[1]

At this point things began to unravel. In June 2008 Putman and Fevola informed Wealth Management's board that they had received kickbacks for steering assets to a life-insurance financing fund, and investors learned that the SEC was investigating Wealth Management's investment practices. These revelations led to a

---

[1] In early June 2008, Wealth Management sent a similar letter to investors in Watch Stone.

rash of employee resignations, and in December 2008 Wealth Management provided written notification to investors of its decision to completely suspend redemptions and liquidate the Wealth Management funds.

Two investors in Gryphon are the objectors in this appeal—Dr. Edwin Wilson and James and Sandra Verhoeven.[2] After receiving the February 2008 letter limiting redemptions to two percent of an investor's equity, Wilson notified Gryphon of his intent to redeem his entire investment; it appears that Wilson received a two-percent redemption in the spring of 2008. Similarly, on May 1, 2008, the Verhoevens asked to fully redeem their equity. Wealth Management noted this request in its records, and the Verhoevens received partial redemptions in June and September 2008.

## B.  Court Proceedings

On May 20, 2009, the SEC commenced an enforcement action against Wealth Management, Putman, and Fevola in federal court in the Eastern District of Wisconsin. The thrust of the multicount complaint was that Putman and Fevola misled investors regarding the safety and liquidity of the subject Wealth Management funds—a breach of their fiduciary duty to investors who sought low-risk investments—and that Wealth Management's com-

---

[2] On appeal Dr. Wilson appears as the Edwin Wilson M.D. IRA, and the Verhoevens appear as the James P. and Sandra J. Verhoeven Revocable Trust.

munications to investors were based on inflated values reported by third-party managers, which Wealth Management failed to independently investigate. The complaint also alleged that Putman and Fevola had received roughly $1.2 million in kickbacks for investing in two life-insurance financing funds that were managed by an individual who had previously been the subject of an SEC enforcement action.

The SEC asked the court to freeze Wealth Management's assets and appoint a receiver for the firm and the funds. The court granted both motions, and Attorney Faye Feinstein was appointed as receiver. In addition to managing the liquidation of Wealth Management's assets, Feinstein was tasked with preparing an independent accounting of the individual funds' assets, identifying any that could be recovered, and developing a plan for distribution to Wealth Management's creditors and equity investors. The receiver's accounting revealed that the funds had only $6.3 million in recoverable assets to distribute, so most investors stood to recover only pennies on the dollar.

In September 2009 the receiver submitted her proposed distribution plan to the district court for approval. As relevant here, the plan sought to distribute Wealth Management's assets to investors on a pro rata basis. Feinstein had concluded that no investors were creditors of Wealth Management, and thus her plan treated all investors equally as equity holders, regardless of whether an investor had submitted a request to redeem his or her interest. The proposed plan also imposed a May 31, 2008

redemption "cutoff date." Redemption distribtions received after the cutoff date would be offset against the investor's total distribution; redemption distributions received prior to that date would not. The receiver said she selected May 31, 2008, as the cutoff date because the SEC investigation become public in June 2008 and triggered a spike in redemption requests.

Six investors, including Wilson and the Verhoevens, filed objections to the plan. They claimed that their requests to redeem their shares required that they be treated as creditors with priority over nonredeeming investors. The district court disagreed. On November 20, 2009, the court issued an order overruling the objections and approving the receiver's distribution plan. The judge agreed with the receiver that a pro rata distribution among investors—regardless of whether a request for redemption had been made—was a fair and equitable method of distributing the funds' diminished assets. In reaching this conclusion, the judge analogized to the bankruptcy doctrine of equitable subordination; giving a preference to investors who submitted redemption requests would "elevate form over substance."

The judge also rejected the objectors' related contention that the receiver was required to follow Wisconsin law in classifying investors' claims. In the alternative the court held that under Wisconsin law, the objectors would not qualify as creditors with priority over nonredeeming investors. The court concluded that the distinction between redeeming and nonredeeming investors was relevant to the question of offset but did not

affect an investor's priority status. After considering various alternatives, the court approved the receiver's proposal to use May 31, 2008, as a reasonable offset cutoff date.

The objectors appealed from the November 20 order and moved to stay any distributions under the plan; the district court denied this motion. The objectors then asked this court to stay distributions pending resolution of their appeal; a motions panel likewise denied the stay. The receiver then distributed approximately $4.2 million of the roughly $6.3 million trust balance, holding back the remainder to cover accrued and ongoing administrative costs. This took place after briefing was complete but about three weeks before oral argument, so the receiver moved to dismiss the appeal or to summarily affirm. She invoked the doctrine of "equitable mootness," arguing that unwinding the distribution would be inequitable to investors and pose administrative problems. We ordered a response and said we would consider the motion with the merits of the appeal.

## II.  Discussion

### A.  Appellate Jurisdiction

The district court's order affirming the receiver's distribution plan is not a final order, so we cannot exercise jurisdiction under 28 U.S.C. § 1291. *See SEC v. Forex Asset Mgmt. LLC,* 242 F.3d 325, 330 (5th Cir. 2001) (concluding that an order approving a plan of distribution is not final because it "does not end the litigation on the merits"

but "is only one part of the overall litigation by the SEC" (quotation marks omitted)). Jurisdiction over this interlocutory appeal is premised on the collateral-order doctrine; though a question of first impression in this circuit, the Fifth and Sixth Circuits have held that the collateral-order doctrine permits interlocutory review of a district-court order approving a receiver's plan of distribution. *See SEC v. Basic Energy & Affiliated Res., Inc.*, 273 F.3d 657, 666-67 (6th Cir. 2001); *Forex Asset Mgmt.*, 242 F.3d at 330-31. We agree.[3]

The collateral-order doctrine permits interlocutory review of "that small class [of decisions] which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until

---

[3] We note that the objectors have standing to pursue this appeal even though they are not parties to the underlying SEC enforcement action and did not seek to intervene below. *SEC v. Wozniak*, 33 F.3d 13, 14 (7th Cir. 1994), held that nonparty investors affected by a receiver's plan of distribution could not appeal without becoming formal parties to the litigation by intervening in the district court. However, our decision in *Wozniak* was out of step with our sister circuits and was undermined by the Supreme Court's decision in *Devlin v. Scardelletti*, 536 U.S. 1 (2002). Recognizing this, we overruled *Wozniak* in *SEC v. Enterprise Trust Co.*, 559 F.3d 649, 652 (7th Cir. 2009), and held that nonparty, nonintervening investors affected by a receiver's plan of distribution have standing to appeal an order approving the plan.

the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). To fall within the scope of this doctrine, the order must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the underlying action, and be effectively unreviewable on appeal from a final judgment. *Mohawk Indus. v. Carpenter*, 130 S. Ct. 599, 605 (2009).

The order approving the receiver's plan of distribution satisfies all three criteria. First, the order conclusively determines the disputed question—how the recovered assets in the receivership will be distributed. *See Forex Asset Mgmt.*, 242 F.3d at 330. Second, the manner in which the assets will be distributed is important to the defrauded investors and is independent of the merits of the underlying SEC enforcement action against Wealth Management, Putman, and Fevola. *See id.* Finally, the order will be effectively unreviewable after the court enters a final judgment because the assets will have been distributed by that point, *see id.*; interlocutory review makes sense out of fairness to the investors and as a matter of judicial economy.

### B.  Federal Rule of Appellate Procedure 3(c)

Although we can properly exercise jurisdiction over the objectors' appeal, there is one more procedural wrinkle we must iron out. Federal Rule of Appellate Procedure 3 requires a notice of appeal to "specify the party or parties taking the appeal by naming each one in the caption or body of the notice." FED. R. APP. P. 3(c)(1)(A). Rule 3(c)'s

specificity requirement exists to give "fair notice of the specific individual or entity seeking to appeal." *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 318 (1988). This requirement is not a mere formality; the Supreme Court has instructed that "[t]he failure to name a party in a notice of appeal . . . constitutes a failure of that party to appeal." *Id.* at 314. The rule also provides, however, that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." FED. R. APP. P. 3(c)(4). Accordingly, we have held that an appeal should not be dismissed "if the notice as a whole is not misleading." *Bradley v. Work*, 154 F.3d 704, 707 (7th Cir. 1998); *see also Torres*, 487 U.S. at 318 (noting that dismissal is not appropriate if the notice of appeal informs the court and interested parties who is filing the appeal).

The notice of appeal in this case names the James P. and Sandra J. Verhoeven Revocable Trust as an appellant. The Verhoevens' trust was not the objector below, however; the Verhoevens objected as individuals. This technical discrepancy does not warrant dismissal. There is no real confusion as to the identity of the appellants. Whether the Verhoevens appear before this court through their trust or as individuals is not relevant to the facts or merits of their position; they are united as parties in interest. *See United States v. Segal*, 432 F.3d 767, 772 (7th Cir. 2005) (noting that a technical failure does not warrant dismissal if the appellees have not been misled).

**C. The Receiver's Motion to Dismiss**

As we have noted, the receiver moved to dismiss the appeal or summarily affirm in light of her distribution of most of the receivership assets after the objectors' stay requests were denied. She argues that unwinding this distribution would be inequitable to innocent third-party investors and create administrative difficulties to boot. This argument is premised on an equitable doctrine in bankruptcy law—sometimes referred to as "equitable mootness"— that essentially derives from the principle that "in formulating equitable relief a court must consider the effects of the relief on innocent third parties."[4] *In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994). The doctrine has been applied in the context of securities-fraud receiverships, *see SEC v. Wozniak*, 33 F.3d 13, 15 (7th Cir. 1994) (noting in dicta that the doctrine would govern the decision of whether to undo a distribution by a securities-fraud receiver), *overruled on*

---

[4] Although it is known as the doctrine of "equitable mootness," we have said that "we shy away from this term because it fosters confusion." *United States v. Segal*, 432 F.3d 767, 774 n.4 (7th Cir. 2005). "There is a big difference between *inability* to alter the outcome (real mootness) and *unwillingess* to alter the outcome ('equitable mootness'). Using one word for two different concepts breeds confusion." *In re UNR Indus., Inc.*, 20 F.3d 766, 769 (7th Cir. 1994). This appeal is not constitutionally moot. The receiver still controls more than $2 million and may recover additional assets, so fashioning some form of relief remains possible. *See In re Envirodyne Indus., Inc.*, 29 F.3d 301, 303-04 (7th Cir. 1994).

*other grounds by SEC v. Enter. Trust Co.*, 559 F.3d 649 (7th
Cir. 2009); *SEC v. Capital Consultants, LLC*, 397 F.3d 733,
745-46 (9th Cir. 2005) (applying the doctrine when con-
sidering whether to unwind a receiver's distribution
plan in a securities-fraud case); *see also Segal*, 432 F.3d
at 773-74 (invoking the doctrine when evaluating whether
to undo a business transaction resulting from a RICO
forfeiture), and is properly invoked here.

Two factors are key to resolving the receiver's motion:
(1) the legitimate expectations engendered by the plan;
and (2) the difficulty of reversing the consummated
transactions. *See In re Envirodyne Indus.*, 29 F.3d at
304 (considering whether a "modification of a plan of
reorganization would upset legitimate expectations");
*In re UNR Indus., Inc.*, 20 F.3d 766, 770 (7th Cir. 1994)
(noting that the court examines "the reliance interests
engendered by the plan, coupled with the difficulty of
reversing the critical transactions"). The inquiry is fact-
intensive and weighs "the virtues of finality, the passage
of time, whether the plan has been implemented and
whether it has been substantially consummated, and
whether there has been a comprehensive change in cir-
cumstances." *Segal*, 432 F.3d at 774 (citing cases) (quotation
marks omitted).[5]

---

[5] The Ninth Circuit also considers whether the appellant
moved for a stay in the district court. *See SEC v. Capital Con-
sultants, LLC*, 397 F.3d 733, 745 (9th Cir. 2005). This factor
is neutralized by the reality that "[a] stay not sought, and
a stay sought and denied, lead equally to the implementa-
(continued...)

There is no question that unwinding the distribution would raise serious equitable concerns vis-à-vis the nonobjecting investors. It would also pose administrative hurdles, although this transaction—involving roughly 300 investors and just over $4.2 million—is not as complex as other transactions we have refused to unsettle. *See, e.g., In re UNR Indus.*, 20 F.3d at 769-70 (refusing to unwind multimillion-dollar bankruptcy reorganization involving some 15 million shares of stock). But because we are affirming on the merits, we need not take the analysis any further. *See In re Envirodyne Indus.*, 29 F.3d at 304 (refusing to rule on the "equitable mootness" question when it was not outcome-determinative).

### D. The Plan of Distribution

In supervising an equitable receivership, the primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable. *See Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 84 (2d Cir. 2006). The district court has broad equitable power in this area, so appellate scrutiny is narrow; we review the decision below for abuse of discretion. *Enter. Trust Co.*, 559 F.3d at 652.

Because the recoverable funds fell far short of the total assets under management, the district court concluded

---

[5] (...continued)

tion of the plan of reorganization." *In re UNR Indus.*, 20 F.3d at 770.

that the more reasonable course was to distribute assets on a pro rata basis rather than try to trace assets to specific investors. Underlying this conclusion was the idea that all investors should be treated equally, without regard to whether an investor had attempted to redeem his equity investment.[6] Specifically, the court held that the claims of redeeming and nonredeeming shareholders were identical in substance—all were defrauded investors whose claims derived from equity interests in Wealth Management. The court concluded that giving redeeming shareholders priority over nonredeeming shareholders would impermissibly "elevate form over substance." The court also rejected the objectors' argument that 28 U.S.C. § 959(b) required the receiver to follow state law, but held in the alternative that even if state law controlled, the objectors would not qualify as creditors entitled to preference.

---

[6] In general and in this context, creditors hold claims against the company in liquidation, whereas investors hold equity interests. When an equity investor seeks to redeem shares—thereby converting his equity interest into corporate debt—that investor may become an unsecured creditor. Both Wisconsin and Delaware follow the rule that creditors must be paid before holders of equity interests. *See* DEL. CODE ANN. tit. 6, § 18-804 (priority in winding up an LLC); WIS. STAT. § 183.0905 (same); DEL. CODE ANN. tit. 6, § 17-804 (winding up of a limited partnership); WIS. STAT. § 179.74 (same). The receiver's plan provided that distributions will be made to Wealth Management's creditors (all of whom are secured) before its investors. For reasons we explain, *infra,* the district court properly concluded that the objectors were not creditors.

We start with the principle that where investors' assets are commingled and the recoverable assets in a receivership are insufficient to fully repay the investors, "equality is equity." *Cunningham v. Brown*, 265 U.S. 1, 13 (1924). Distribution of assets on a pro rata basis ensures that investors with substantively similar claims to repayment receive proportionately equal distributions. Courts have routinely endorsed pro rata distribution plans as an equitable way to distribute assets held in receivership in this situation. *See, e.g., Forex Asset Mgmt.*, 242 F.3d at 331-32 (affirming pro rata distribution even where objecting investors' funds were segregated in a separate account and never commingled, noting that whether funds are commingled or traceable is "a distinction without a difference"); *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88-90 (2d Cir. 2002) (finding that pro rata distribution is particularly appropriate where funds are commingled and investors are similarly situated); *United States v. Durham*, 86 F.3d 70, 72-73 (5th Cir. 1996); *SEC v. Elliott*, 953 F.2d 1560, 1569-70 (11th Cir. 1992) (finding that tracing is inequitable and approving pro rata distribution); *In re Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d 182, 195-96 (S.D.N.Y. 2009); *SEC v. Byers*, 637 F. Supp. 2d 166, 176-77 (S.D.N.Y. 2009).

To implement an effective pro rata distribution, district courts supervising receiverships have the power to "classify claims sensibly." *Enter. Trust Co.*, 559 F.3d at 652. This power includes the authority to subordinate the claims of certain investors to ensure equal treatment. The Bankruptcy Code codifies the doctrine of equitable subordination and grants bankruptcy courts

the power to subordinate certain claims; this includes treating shareholders who redeemed their shares as equity holders rather than unsecured creditors. 11 U.S.C. § 510(c)(1); *see also In re Envirodyne Indus.*, 79 F.3d 579, 582 (7th Cir. 1996). The goal in both securities-fraud receiverships and liquidation bankruptcy is identical— the fair distribution of the liquidated assets. *See In re Envirodyne Indus.*, 79 F.3d at 583. Equitable subordination promotes fairness by preventing a redeeming investor from jumping to the head of the line and recouping 100 percent of his investment by claiming creditor status while similarly situated nonredeeming investors receive substantially less. *See Elliott*, 953 F.2d at 1569.

The district court faithfully applied these principles in endorsing the receiver's proposed pro rata distribution in this case. The court considered the claims of investors who attempted to redeem their equity and determined that the substance of those claims was identical to the claims of nonredeeming equity shareholders. By subordinating the objectors' claims and effectuating a pro rata distribution of assets, the district court avoided the inequity of giving some investors preference even though all investors' claims were substantively the same. *See United States v. Vanguard Inv. Co.*, 6 F.3d 222, 226-27 (4th Cir. 1993); *Elliott*, 953 F.2d at 1569. This was a reasonable exercise of the court's discretion.

But the objectors maintain they were legally *entitled* to preference. For support they cite 28 U.S.C. § 959(b), which governs the conduct of receivers and provides, in relevant part:

> [A] trustee receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b). The import of this provision is readily apparent: Just as an owner or possessor of property is required to comply with state law, so too must a receiver comply with state law in the "management and operation" of the receivership property in his possession. On its face, § 959(b) has no particular significance for *distribution* decisions in a liquidation; that is, it does not affect the receiver's—or the court's—classification or subordination of claims.

Long ago, the Second Circuit read § 959(b)'s predecessor statute in this way. The court noted that liquidation was "[m]erely to hold matters in statu quo; to mark time, as it were; to do only what is necessary to hold the assets intact." *Vass v. Conron Bros. Co.*, 59 F.2d 969, 971 (2d Cir. 1932) (Hand, J). Accordingly, because liquidation was not "a continuance of the business," the statute did not apply to liquidations. *Id.* Modern courts have followed this reasoning and likewise concluded that § 959(b) does not apply to liquidations. *See, e.g.*, *In re N.P. Mining Co.*, 963 F.2d 1449, 1460 (11th Cir. 1992) ("A number of courts have held that section 959(b) does not

apply when a business's operations have ceased and its assets are being liquidated."); *Saravia v. 1736 18th St., N.W., LP*, 844 F.2d 823, 827 (D.C. Cir. 1988) (viewing "the statute as applying only to operating businesses, not ones that were in the process of being liquidated"); *In re Valley Steel Prods. Co.*, 157 B.R. 442, 447-49 (Bankr. E.D. Mo. 1993) (holding § 959(b) does not apply to liquidations and citing cases). We agree with this reading of the statute.[7]

In any event, the objectors do not qualify as creditors under Wisconsin law. In Wisconsin a holder of an equity interest in a limited-liability company becomes a creditor "[a]t the time that a member becomes entitled to receive a distribution . . . ." WIS. STAT. § 183.0606. The time at which a member is entitled to receive a distribution is governed by the limited-liability company's oper-

---

[7] We note that the Sixth Circuit has suggested in dicta that § 959(b) requires receivers to comply with state law regardless of whether the receiver is liquidating an estate or actively managing it. *See In re Wall Tube & Metal Prods. Co.*, 831 F.2d 118, 122 (6th Cir. 1987). We think *Wall Tube* must be read in light of its facts. The case involved the cleanup of an environmental accident and the applicability of state laws governing the disposal of hazardous waste; it appears that the Sixth Circuit meant to suggest only that § 959(b) requires a liquidating receiver to comply with state laws regulating public health, safety, and welfare when liquidating receivership property. *See id*. In *Midlantic National Bank v. New Jersey Department of Environmental Protection*, 474 U.S. 494, 505 (1986), the Supreme Court explicitly declined to decide whether § 959(b) applies to liquidations.

ating agreements. *Id.* §§ 183.0603, 183.0604. Gryphon is the relevant limited-liability company here, and section 5.3 of Gryphon's operating agreement permits the fund's managing member to restrict distributions when "existing economic or market conditions or conditions relating to [Gryphon]" render "withdrawals or payments of withdrawals . . . impracticable." Pursuant to this provision, Gryphon's managing member elected to limit distributions to two percent per quarter of an investor's equity, and in February 2008 all investors received a letter informing them of this restriction on redemptions. The objectors received the two-percent distributions to which they were entitled, but beyond that, pursuant to Gryphon's operating agreement, they were not "entitled to receive a distribution" and therefore did not become creditors.

The objectors also challenge the district court's approval of May 31, 2008, as the cutoff date for determining whether a redemption distribution would be offset against an investor's plan distribution. They contend that this offset provision is arbitrary and inequitable, particularly with respect to the Verhoevens.[8]

---

[8] The objectors also suggest that the cutoff date operates as an illegal "clawback." We disagree. The receiver was not attempting to recover assets held by investors—because they were in some way tainted by the fraud or otherwise—as in the typical clawback action. Here, the assets in question were always in possession of the receivership trust and no clawback occurred. Moreover, the case on which the objectors

(continued...)

Before proceeding, a brief detour into the chronology of the Verhoevens' redemption requests is required. In March 2006 the Verhoevens began redeeming their equity investment at a rate of $15,000 per quarter, and in February 2008 they made quarterly redemption requests for the quarters ending March 31, 2008; June 30, 2008; and September 30, 2008. Then on May 1, 2008, they submitted a full redemption request, but they did not receive a disbursement prior to the May 31 cutoff date. As we have noted, the receiver selected May 31, 2008, as the cutoff date because the SEC investigation was disclosed in June and redemption activity spiked across the Wealth Management funds. The cutoff date was instituted to acknowledge this change in circumstances.

---

[8] (...continued)

rely for this argument, *Janvey v. Adams*, 588 F.3d 831 (5th Cir. 2009), is not on point. The issue in *Janvey* was whether the district court had the authority to freeze assets the receiver sought to "claw back" when the holders of the assets were not relief defendants. The Fifth Circuit held that the district court lacked this authority; it did not consider the equities of clawing back those assets. *Id.* at 835. The objectors further contend, though only in passing, that the offset provision ignores their "choate creditor rights." But as we have already noted, they are not properly considered creditors. Finally, to the extent that the objectors argue that the offset provision violates their due-process rights, this argument was underdeveloped in the district court and on appeal. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 656 (7th Cir. 2003) (underdeveloped arguments are waived).

The district court considered and rejected alternatives to the offset provisions and held that the May 31, 2008 cutoff date was reasonable in light of the increase in redemptions after the June 2008 disclosure of the allegations about Wealth Management's malfeasance. Specifically, the judge recognized that the receiver basically had three options—offset all redemptions, offset no redemptions, or select a cutoff date to determine which redemptions to offset. The judge acknowledged that any cutoff date would be both over- and under-inclusive, but thought it was more equitable to use a cutoff date than to offset either all or no redemptions. That is, offsetting all redemptions would penalize investors who made early redemption requests; offsetting none would reward redeeming investors at the expense of nonredeeming investors.

The district court also considered the possibility of investigating the circumstances of each investor's redemption request and setting off any resulting payment against the final distribution only when the request was linked to the SEC action. Although this sort of case-by-case analysis has intuitive appeal, the ultimate goal of a receivership is to maximize the recovery of the investor class, and "each investor's recovery comes at the expense of the others." *SEC v. Byers*, 637 F. Supp. 2d at 176. Investigating individual claims is expensive and, as the receiver has noted, would drain the receivership estate. Receivers have a duty to avoid overly costly investigations, and at a certain point, the costs of such individualized determinations outweigh the benefits. *See In re Equity Funding Corp. of Am. Secs. Litig.*, 603 F.2d 1353, 1365 (9th Cir. 1979).

We conclude that the district court was within its discretion to reject a case-by-case determination as too costly and time consuming. And the court reasonably settled on a fixed cutoff date as the most equitable way to balance the claims of individual investors against the requirements of a cost-effective and administratively efficient distribution. Similar offset provisions have been upheld in other cases. *See Capital Consultants, LLC*, 397 F.3d at 741; *SEC v. Wang*, 944 F.2d 80, 87-88 (2d Cir. 1991); *In re Equity Funding Corp. of Am. Secs. Litig.*, 603 F.2d at 1363-65; *In re Reserve Fund Secs. & Derivative Litig.*, 673 F. Supp. 2d at 201.

For the foregoing reasons, we see no abuse of discretion in the district court's oversight of the receiver's planned distribution of receivership assets. Accordingly, the district court's order approving the plan is AFFIRMED.