In the

# United States Court of Appeals

### For the Seventh Circuit

No. 12-1285

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff*,

*v.*

WILLIAM A. HUBER and HUBADEX, INC.,

*Defendants*.

APPEAL OF:

RICHARD MEREL *et al.*

KEVIN B. DUFF, Receiver,

*Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
Nos. 09 C 6068—**Ruben Castillo**, *Judge*.

ARGUED SEPTEMBER 5, 2012—DECIDED NOVEMBER 29, 2012

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*. William Huber operated a Ponzi scheme in which 118 investors lost a total of $22.6 million.

He had told his investors—mainly friends and acquaintances, who trusted him—that he administered three investment funds, using a computer trading model. He had started the funds in 1996 but by 1998 or 1999 had converted them (secretly of course) to a Ponzi scheme in order to cover losses that the funds had incurred. Eventually his fraud was discovered. He was prosecuted, pleaded guilty to mail fraud and related crimes, and was sentenced to 20 years in prison. See *United States v. Huber*, 455 Fed. Appx. 696, 697 (7th Cir. 2012); Tony Reid, "Forsyth Man Accused of Ponzi Scam That Swindled Local Residents Out of Millions," *Herald & Review*, Oct. 1, 2009, http://herald-review.com/article_82e2ee7f-d215-5d17-b64e-ae275a4bbb0f.html (visited Nov. 5, 2012). A receiver appointed to marshal and distribute the assets remaining in Huber's funds was able to get his hands on some $7 million, or roughly 24 percent of the total amount of money that had been invested in the funds ($7 million ÷ [$22.6 million + $7 million]) and has thus far distributed all but about $1 million to the 118 investors. This appeal concerns the $1 million balance remaining to be distributed.

Instead of distributing the recovered assets pro rata among the investors, the receiver made a distinction among investors that eleven of them, the appellants, are challenging. They had withdrawn portions of their investment from Huber's funds before the scheme was exposed. With the approval of the district court the receiver counted the withdrawals as partial compensation for these investors' losses. In doing so he was using what is called the "rising tide" method of al-

locating assets held by a receiver for distribution to creditors; the appellants argue that he should have used the "net loss" method (sometimes called the "net investment" method) instead.

To understand the difference between the two methods, imagine that three investors lose money in a Ponzi scheme. *A* invested $150,000 and withdrew $60,000 before the scheme collapsed, so his net loss was $90,000. *B* invested $150,000 but withdrew only $30,000; his net loss was $120,000. *C* invested $150,000 and withdrew nothing, so lost $150,000. Suppose the receiver gets hold of $60,000 in assets of the Ponzi scheme—one-sixth of the total loss of $360,000 incurred by the three investors ($90,000 + $120,000 + $150,000). We'll call these recovered assets "receivership assets." Under the net loss method each investor would receive a sixth of his loss, so *A* would receive $15,000, *B* $20,000, and *C* $25,000, as shown in the following chart; the pale blocks are the amounts received by the investors and the dark blocks are the withdrawals.



Under the rising tide method, withdrawals are considered part of the distribution received by an investor and so are subtracted from the amount of the receivership assets to which he would be entitled had there been no withdrawals. (When there are no withdrawals, rising tide yields the same distribution of receivership assets as net loss.) In our example, the total of withdrawn plus receivership assets is $150,000 ($60,000 + $30,000 + $0 [the withdrawals] + $60,000 [the receivership assets]), but there is only the $60,000 in such assets to distribute. *A*, having been deemed (as a consequence of the rising tide approach) to have "recovered" $60,000 before the collapse of the Ponzi scheme, is entitled to nothing from the receiver, as otherwise the remaining sum of withdrawals and receivership assets—a total of $90,000 ($30,000 in withdrawals, all by *B*, and $60,000 in receivership assets)—would be insufficient to bring the remaining

investors up to anywhere near *A*'s level. For remember that under the net loss method each investor would have received the same fraction of receivership assets as his fraction of the loss, and thus *A* would have received $15,000, *B* $20,000, and *C* $25,000. The result, since under the rising tide method withdrawals are treated as compensation, is that *A* would have been "compensated" to the tune of $75,000 ($60,000 withdrawn + $15,000 in receiver assets), *B* $50,000 ($30,000 + $20,000), and *C* $25,000 (the balance of receiver assets, *C* having had no withdrawals).

For the "tide" to raise *B* and *C* as close to *A* as possible, *B* has to receive $15,000 in receiver assets, for a total "recovery" of $45,000, and *C* the remaining receiver assets, giving him $45,000 too. The division of withdrawals plus receiver assets is then 60-45-45, as shown in the next chart, versus 75-50-25 under the net loss method.



*A* and *B*, the withdrawers, are thus disadvantaged in the litigation by the rising tide method compared to the net loss method; they correspond to the eleven appellants. *C*, the non-withdrawer, is advantaged; he corresponds to the investors in Huber's scheme who had made no withdrawals.

Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets. See, e.g., *In re Receiver*, No. 3:10-3141-MBS, 2011 WL 2601849, at *2, *4 (D.S.C. July 1, 2011); *CFTC v. Lake Shore Asset Management Ltd.*, No. 07 C 3598, 2010 WL 960362, at *7-10 (N.D. Ill. March 15, 2010); *CFTC v. Equity Financial Group, LLC*, No. Civ. 04-1512 RBK AMD, 2005 WL 2143975, at *24-25 (D.N.J. Sept. 2, 2005); *United States v. Cabe*, 311 F. Supp. 2d 501, 509-11 (D.S.C. 2003); *CFTC v. Hoffberg*, No. 93 C 3106, 1993 WL 441984, at *2-3

(N.D. Ill. Oct. 28, 1993). But the net loss method is some-times used instead. See *SEC v. Byers*, 637 F. Supp. 2d 166, 182 (S.D.N.Y. 2009); *CFTC v. Barki, LLC*, No. 3:09 CV 106-MU, 2009 WL 3839389, at *2 (W.D.N.C. Nov. 12, 2009); *SEC v. AmeriFirst Funding, Inc.*, No. 3:07-cv-1188-D, 2008 WL 919546, at *6 (N.D. Tex. March 13, 2008); *CFTC v. Franklin*, 652 F. Supp. 163, 169-70 (W.D. Va. 1986); see generally Kathy Bazoian Phelps, "Handling Claims in Ponzi Scheme Bankruptcy and Receivership Cases," 42 *Golden Gate U. L. Rev.* 567, 572-77 (2012).

Our appellants argue against rising tide on the ground that they shouldn't be penalized for having withdrawn some of "their" money. But it was not *their* money; they withdrew portions of the commingled assets in the Ponzi schemer's funds. Those were stolen moneys, albeit stolen in part from the eleven appellants. An investor has no entitlement to money stolen from other people. When investors' funds are commingled, none being traceable to a particular investor, no part of whatever funds are recovered is property of any investor. Instead each investor is a creditor, and has merely a claim to a share of the funds that is appropriate in light of the relative size of his investment and other relevant circumstancea. Those circumstances can include with-drawals, which give credibility to a Ponzi scheme by demonstrating that it has assets—although withdrawals also may cause the scheme to run out of assets sooner and therefore collapse before additional investments are sucked into the whirlpool.

But while the rising tide method discourages partial exit in the form of withdrawals because withdrawers are

denied any further recovery, it also encourages a withdrawer to withdraw his entire investment, since he won't be treated as well in the distribution of receiver assets if it turns out that he invested in a Ponzi scheme. Which method of allocation makes the scheme likely to collapse earlier is therefore unclear, and the public interest in the swift collapse of such schemes (see Saul Levmore, "Rethinking Ponzi-Scheme Remedies in and out of Bankruptcy," 92 *B.U. L. Rev.* 969 (2012)) therefore does not support one method over the other even when withdrawals are driven by suspicions about the scheme's legitimacy rather than by chance.

Investors who have made withdrawals will tend to be better off when the Ponzi scheme collapses than investors who have made no withdrawals because the former lose less than they would have lost had they not drawn down their investment. But if they have spent the money they withdrew, they may find themselves with all or most of their savings still in the Ponzi scheme. Such investors would tend to place a high marginal utility on whatever receivership assets they received, yet under rising tide would receive less than under net loss, and maybe nothing. The net loss approach is particularly attractive, therefore, when under rising tide a large number of investors—45 percent in *SEC v. Byers, supra*, 637 F. Supp. 2d at 182, and 55 percent in *CFTC v. Barki, LLC, supra*, 2009 WL 3839389, at *2, two cases in which net loss was used to allocate receivership assets in preference to rising tide—would receive nothing. The more investors in a Ponzi scheme there are who would receive nothing

under rising tide and might therefore have difficulty paying their future expenses, the more likely the net loss method is to maximize the overall utility of the investors. But only 18 percent of the investors in Huber's scheme receive nothing under rising tide, and so in this case that method is an acceptable alternative to net loss.

We are given pause, however, by the situation of an investor who having withdrawn some money from the Ponzi scheme then reinvests it. Suppose he had initially invested $150,000 and then, shortly after withdrawing $50,000, he reinvested it, thus restoring his balance to $150,000, all of which he lost when the scheme collapsed. Under the rising tide method he would be credited with having invested $200,000 ($150,000 plus $50,000) and having recouped a quarter of that amount by his withdrawal, and thus would receive a reduced share of recovered assets compared to a person who had invested $150,000 and lost it without any interim withdrawals. We can't see why those two investors should be treated differently, as would be obvious if the withdrawal and reinvestment had occurred on successive days. In cases of withdrawal followed by reinvestment, the investor's maximum balance in the Ponzi scheme ($150,000 in our example) should be treated as his investment; the withdrawals, having in effect been rescinded, should be ignored.

Or so it seems to us; we can't find any discussion in case law or commentary of this "maximum balance" approach. We needn't pursue the issue. Although one of the appellants told the district court that he had with-

drawn money and reinvested it continually, he has given no details and neither he nor any of the other appellants ask us to adopt the maximum-balance approach that we have just described.

There is a final oddity to note: Ponzi schemes often end in bankruptcy court; the net loss rule applies in bankruptcy, 11 U.S.C. § 726(b); and although withdrawals made by investors who knew or should have known of the fraud could be clawed back as fraudulent conveyances in bankruptcy, just as they could be in a receivership, *Jobin v. McKay*, 84 F.3d 1330, 1338-39 (10th Cir. 1996) (bankruptcy); *Scholes v. Lehmann*, 56 F.3d 750, 759 (7th Cir. 1995) (receivership), there is no suggestion that the appellants in our case knew or should have known that Huber was a Ponzi schemer. So their withdrawals could not be clawed back in bankruptcy and therefore they might be better off were Huber's fund in bankruptcy. Whether they would actually be better off would depend on their receiving a sufficiently larger distribution from use of the net loss method to compensate them for the time (and hence lower present value of any recovery) and expense of a bankruptcy proceeding. See *id.* at 755. That will rarely be the case when the investors' individual claims are modest, though we note that a Ponzi scheme might be petitioned into bankruptcy (governed by special rules) by the Securities Investor Protection Corporation if the operator of the scheme was a broker-dealer who was registered with the SEC and had claimed to buy publicly traded securities on behalf of individual investors. See *In re Bernard L.*

*Madoff Investment Securities LLC*, 654 F.3d 229, 232-33 (2d Cir. 2011). But Huber's investors owned shares in his funds, not in particular stocks.

Even if the Ponzi scheme is pushed into bankruptcy, the bankruptcy court, if it thinks rising tide superior to net loss in the circumstances, can allow a previously appointed SEC receiver to control the receivership assets. 11 U.S.C. § 543(d). There is even authority for allowing a district court, at the behest of the SEC when it is a party to a suit (and the SEC is the plaintiff in this case, though not involved in the appeal), to enjoin investors and other creditors from filing a bankruptcy action if that would interfere with the SEC's pursuit of equitable remedies (and a receivership is equitable). See 15 U.S.C. §§ 77t(b), 78u(d)(5)**.** "There is no unwaivable right to file an involuntary bankruptcy petition, and, even if there were, the receivership accomplishes what a bankruptcy would. The receivership protects the assets of the estate, just as a stay would in bankruptcy." *SEC v. Byers*, 609 F.3d 87, 92 (2d Cir. 2010). Although *Gilchrist v. General Electric Capital Corp.*, 262 F.3d 295, 303-04 (4th Cir. 2001), may seem contrary, it is distinguishable because it involved a receivership under state law (the case was in federal court under the diversity jurisdiction) rather than federal securities law and a corporation that the court thought too big to be wound up effectively in a receivership. But we needn't pursue the issue of bankruptcy versus receivership; it's too late for a bankruptcy proceeding in this case.

The cases treat the receiver's choice among allocation schemes as one within the discretion of the district court

to approve or disapprove, like other aspects of the administration of a receivership. *SEC v. Wealth Management LLC*, 628 F.3d 323, 332-33 (7th Cir. 2010); *SEC v. Forex Asset Management LLC*, 242 F.3d 325, 331 (5th Cir. 2001); Grant Christensen, "Allocating Loss in Securities Fraud: Time to Adopt a Uniform Rule for the Special Case of Ponzi Schemes," 3 *William & Mary Business L. Rev.* 309, 319 (2012). The appellants have not shown that the district court abused its discretion, or indeed committed an error of any magnitude, in approving the use of the rising tide method to allocate compensation for losses caused investors by Huber's fraud.

AFFIRMED.