11-1516-cv(L)
CFTC v. 3M Employee Welfare Benefit Association Trust I, et al.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued: May 16, 2012                    Decided:   April 3, 2013)

Docket Nos. 11-1516-cv(L), 11-1517-cv, 11-1738-cv,
11-1741-cv, 11-1859-cv, 11-1879-cv

_____

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff-Appellee-Cross-Appellee,

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellee,

ROBB EVANS & ASSOCIATES LLC,

Receiver-Appellee-Cross-Appellee,

- v. -

STEPHEN WALSH, PAUL GREENWOOD, WESTRIDGE CAPITAL
MANAGEMENT, INC., WG TRADING INVESTORS, LP, WGIA, LLC, WG
TRADING COMPANY LP,

Defendants,

WESTRIDGE CAPITAL MANAGEMENT ENHANCEMENT FUNDS INC.,
WGI LLC, K&L INVESTMENTS, ROBIN GREENWOOD, JANET WALSH,

Relief Defendants.

3M EMPLOYEE WELFARE BENEFIT ASSOCIATION TRUST I, 3M EMPLOYEE WELFARE BENEFIT ASSOCIATION TRUST II, 3M EMPLOYEE WELFARE BENEFIT ASSOCIATION TRUST III, MINNESOTA MINING AND MANUFACTURING EMPLOYEE RETIREMENT INCOME PLAN TRUST, BLUE CROSS AND BLUE SHIELD ASSOCIATION NATIONAL RETIREMENT TRUST, NORTH DAKOTA STATE INVESTMENT BOARD, SACRAMENTO COUNTY EMPLOYEES' RETIREMENT SYSTEM, SAN DIEGO COUNTY EMPLOYEES RETIREMENT ASSOCIATION, KAISER ALUMINUM & CHEMICAL CORPORATION ASBESTOS PERSONAL INJURY TRUST, ALEXANDER DAWSON FOUNDATION, ALEXANDER DAWSON, INC.,

Interested Parties-Appellants-Cross-Appellees,

KERN COUNTY EMPLOYEES' RETIREMENT ASSOCIATION,

Interested Party-Appellee-Cross-Appellant,

ACUMENT GLOBAL TECHNOLOGIES, INC., WELLS FARGO & CO. MASTER PENSION TRUST, CBS MASTER TRUST, CARNEGIE MELLON UNIVERSITY, H-E-B BRAND SAVINGS & RETIREMENT PLAN TRUST, HOUSTON MUNICIPAL EMPLOYEES PENSION SYSTEM, OHIO NORTHERN UNIVERSITY, THE TIMKEN COMPANY COLLECTIVE INVESTMENT TRUST FOR RETIREMENT TRUSTS, UNIVERSITY OF PITTSBURGH - OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, VULCAN MATERIALS COMPANY,

Interested Parties-Appellees-Cross-Appellees.[*]

_____

Before: KEARSE, POOLER, and LIVINGSTON, Circuit Judges.

Appeal and cross-appeal from an order of the United States District Court for the Southern District of New York, George B. Daniels, Judge, approving court-appointed receiver's plan for pro rata, net-investment-based distribution of funds recovered from securities-fraud perpetrators and associated entities, and ordering distribution.

Affirmed.

---

[*] The Clerk of the Court is directed to further amend the official caption to conform with the above.

Dan M. Berkovitz, General Counsel, Jonathan L. Marcus, Deputy General Counsel, Nancy R. Doyle, Assistant General Counsel, Commodity Futures Trading Commission, Washington, D.C., submitted briefs for Plaintiff-Appellee-Cross-Appellee.

Mark D. Cahn, General Counsel, Michael A. Conley, Deputy General Counsel, Jacob H. Stillman, Solicitor, John W. Avery, Deputy Solicitor, David Lisitza, Senior Counsel, Securities and Exchange Commission, Washington, D.C., submitted a brief for Plaintiff-Appellee.

THOMAS S. ARTHUR, Los Angeles, California (Craig A. Welin, Frandzel Robins Bloom & Csato, Los Angeles, California; Gary Owen Caris, Lesley Anne Hawes, McKenna Long & Aldridge, Los Angeles, California; Christopher F. Graham, McKenna Long & Aldridge, New York, New York, on the brief), for Receiver-Appellee-Cross-Appellee.

RICHARD F. ZIEGLER, New York, New York (Elizabeth A. Edmondson, Michael W. Ross, Jenner & Block, New York, New York, for 3M Employee Welfare Benefit Association Trust I, 3M Employee Welfare Benefit Association Trust II, 3M Employee Welfare Benefit Association Trust III, Minnesota Mining and Manufacturing Employee Retirement Income Plan Trust, Blue Cross and Blue Shield Association National Retirement Trust, Sacramento County Employees' Retirement System, and San Diego County Employees Retirement Association; Richard F. Ziegler, Elizabeth A. Edmondson, Michael W. Ross, New York, New York, as Special Assistant Attorneys General for the State of North Dakota, for North Dakota State Investment Board; Lawrence Leo Ginsburg, Moses & Singer, New York, New York, for Kaiser Aluminum & Chemical Corporation Asbestos Personal Injury Trust; Steven F. Molo, MoloLamken, New York, New York, for Alexander Dawson Foundation and Alexander Dawson, Inc., on the brief), for Interested Parties-Appellants-Cross-Appellees.

BENJAMIN G. SHATZ, Los Angeles, California (Manatt, Phelps & Phillips, Los Angeles, California, on the brief), for Interested Party-Appellee-Cross-Appellant.

KEITH W. MILLER, Perkins Coie, New York, New York (Adrienne C. Baranowicz, Paul Hastings, New York, New York, for Acument Global Technologies, Inc., and Wells Fargo

& Co. Master Pension Trust; Scott Humphries, Gibbs & Bruns, Houston, Texas, for Carnegie Mellon University; Kristi A. Davidson, Buchanan Ingersoll & Rooney, New York, New York, Zakarij O. Thomas, Buchanan Ingersoll & Rooney, Pittsburgh, Pennsylvania, for University of Pittsburgh - Of the Commonwealth System of Higher Education; Patrick L. Robson, Shawn Patrick Regan, Hunton & Williams, New York, New York, for Vulcan Materials Company; Hamish P.M. Hume, Boies, Schiller & Flexner, Washington, D.C., Rosanne C. Baxter, Boies, Schiller & Flexner, Armonk, New York, for CBS Master Trust; Robert A. Bell, Jr., Vorys, Sater, Seymour & Pease, Columbus, Ohio, for Ohio Northern University; Joseph N. Froehlich, Locke Lord, New York, New York, for Houston Municipal Employees Pension System; Steven Paradise, Vinson & Elkins, New York, New York, for H-E-B Brand Savings & Retirement Plan Trust; Jeffrey David Zimon, Benesch Friedlander Coplan & Aronoff, Cleveland, Ohio, for The Timken Company Collective Investment Trust for Retirement Trusts, on the brief), <u>for Interested Parties-Appellees-Cross-Appellees</u>.

KEARSE, <u>Circuit Judge</u>:

In these two civil enforcement actions for securities fraud--brought, respectively, by the Commodity Futures Trading Commission ("CFTC") and the Securities Exchange Commission ("SEC") against defendants Stephen Walsh and Paul Greenwood, <u>et al.</u>, and consolidated by this Court for appeal--various entities that were defrauded by the defendants appeal from a March 21, 2011 order ("Order") of the United States District Court for the Southern District of New York, George B. Daniels, <u>Judge</u>, approving initial <u>pro rata</u> distributions on April 20, 2011, totaling $815,000,000 recovered from defendants and associated entities by receiver Robb Evans & Associates LLC ("Robb Evans" or the "Receiver"), in accordance with the plan proposed by the Receiver ("Plan" or "Receiver's Proposed Initial Distribution Plan"). Interested-Parties-Appellants-Cross-Appellees 3M Employee Welfare Benefit Association Trusts I, II, and III, <u>et al</u> (collectively, the "3M Benefits Group" or "3M Group"), contend principally that the district court should have rejected the proposed

4

pro rata distributions because under the Plan, fraud victims who chose allegedly safer investments fare no better than victims whose investments were riskier. Interested-Party-Appellee-Cross-Appellant Kern County Employees' Retirement Association ("KCERA") contends that the district court should have rejected the proposed Plan because it did not provide an adjustment for inflation to compensate longer-term investors. For the reasons that follow, we conclude that the district court did not abuse its discretion in approving the Receiver's Plan, and we therefore affirm the Order.

## I. BACKGROUND

The factual background, for purposes of these appeals, is undisputed. For more than 13 years, beginning prior to 1996, defendants conducted their business--which offered various investment vehicles for pursuing an index arbitrage strategy--as a Ponzi scheme. Defendants issued fraudulent account statements to their investors, withdrew invested moneys in order to spend lavishly on themselves, and funded investor withdrawals with moneys received from other investors when there were no earnings. (See United States v. Greenwood, No. 09 Cr. 722 (S.D.N.Y., Transcript of Guilty Plea of Paul Greenwood, July 28, 2010 ("Greenwood Plea Allocution Tr."), at 23-27).) In pleading guilty to securities fraud, wire fraud, conspiracy to commit those offenses, commodities fraud, and money laundering (see id. at 5-9, 31), Greenwood admitted, inter alia, as follows:

> Q. . . . "[W]hat is it that you cheated the investors in? . . . [W]hat is it that you didn't make return on?
>
> A. On all the money that was lost in . . . investments that were made and didn't produce the returns that we expected them to produce and in money that we took out personally for basically our own use.
>
> Q. That is, you treated these partnerships as your own personal bank account?

A. Correct.

Q. And you drew as you wished?

A. Correct.

Q. What is it that you reported to your investors?

A. Well, we treated the money that we took out as a loan so we would--

Q. On your own books, you mean?

A. On the books of--yes, yes. So we would report to the investors the same rate of return that we earned on the . . . index arbitrage trading.

Q. And that was simply flatly untrue?

A. Correct.

Q. That is, you did not make that money that you reported to investors that you made?

A. That's correct.

Q. And none of your investors asked for the money?

A. When they asked for the money we would give them money back so in some sense--

Q. So this was a Ponzi scheme, as it is loosely called?

A. Well, sort of, because we actually had--

Q. You were using other monies to make up for what you couldn't give?

A. That's correct.

Q. But, of course, you never could make it up entirely?

A. Well, initially we thought we could and as time went on the hole got bigger and bigger and at a point we couldn't.

Q. Well, if you were taking money out for yourselves, you could never make it up, right, unless you made huge profits?

6

A. That's correct.

Q. And you knew that from the beginning, . . . if you were taking it for personal use?

. . . .

A. Early on after the partnership was established and the investors had given us the money, it became apparent we couldn't give back the money we were taking out.

(Greenwood Plea Allocution Tr. 24-25.)

On February 25, 2009, the CFTC and the SEC commenced the present civil enforcement actions against Greenwood, Walsh, and their related entities, alleging violations of various federal securities laws, seeking disgorgement of the proceeds of the frauds and restitution for the fraud victims, and obtaining a preliminary injunction enjoining any diversion of defendants' assets. The court appointed Robb Evans as temporary receiver of the defendants' assets on that date and continued its appointment as Receiver in an order entered in May 2009. The following descriptions of the fraudulent scheme are taken largely from reports to the district court by Robb Evans in May 2009 ("2009 Report" or "Receiver's 2009 Report") and June 2010 ("2010 Report" or "Receiver's 2010 Report"), which the parties to these appeals have not disputed.

A. Details of the Fraud

Greenwood and Walsh created several entities to offer investment vehicles to the pension funds or investment arms of governmental entities and other large institutions. The Greenwood and Walsh entities included defendant Westridge Capital Management, Inc. ("Westridge"), a Delaware corporation; defendant WG Trading Company LP ("WGTC"), a Delaware limited partnership; and defendant WG Trading Investors, LP ("WGTI"), a Delaware limited

7

partnership that was itself a limited partner in WGTC. Greenwood and Walsh were the managing general partners of WGTC and WGTI.

Greenwood and Walsh represented to potential investors that Westridge, a registered investment adviser regulated by the SEC, provided various investment vehicles for pursuing an S&P 500 index arbitrage strategy that they called an "Enhanced Equity Index" program, and which they described as having outperformed the S&P 500. (See Receiver's 2009 Report at 4-5.) Westridge was to hold approximately 15% of each investor's cash investment in reserve "to support a leveraged futures position" and the investor would direct the remaining 85% of its cash investment to another affiliated entity, usually either WGTC or WGTI. (Id. at 5.) By choosing the former, the investor would become a limited partner in WGTC, a broker/dealer that was subject to independent audits and was regulated by, inter alia, the SEC, the Financial Industry Regulatory Authority ("FINRA"), and the CFTC. (See id.) "WGTC was engaged primarily in computer-directed index arbitrage trading strategies seeking profit opportunities by exploring relationships among stock index futures contracts, stock market indexes upon which the futures contracts were based, the stocks included in the indexes, and the cost (e.g. interest expense) and benefits (e.g. dividend income) of carrying the instruments." (Id. at 7.)

Alternatively, the investor could direct the non-reserved 85% of its cash investment to WGTI, a nonpublic entity that was not subject to either independent audits or government regulation, and that issued senior promissory notes. (See 2009 Report at 5.) An investor could become a WGTI noteholder either directly by purchasing those notes or indirectly by purchasing non-voting shares in Westridge Capital Management Enhancement Funds, Inc., a British Virgin Islands company that would purchase the WGTI promissory notes. (See id.) Prospective WGTI investors

were told that "the only business of WGTI is to invest in WGTC" (id. at 6), and that "the proceeds of the senior promissory notes issued by WGTI would be sent to WGTC" (id.). Further, prospective investors in WGTI were told that their returns would be indexed to the returns of the limited partners of WGTC:

> For purposes of determining the interest accruing and payable on the promissory notes, the index was the performance of a hypothetical investment equal in amounts to the principal of the promissory notes invested in the limited partnership interest of WGTC.

(Id. at 11.) Thus, WGTI was to earn money when WGTC's trading strategies were successful, and investors in WGTI were told they would profit as WGTC did. Consistent with these representations as to the calculation of earnings, "the returns of investments in WGTI were computed exactly the same as that in WGTC." (Id.)

Nonetheless, WGTI investors were also assured that, as senior promissory note holders, their returns would not match those of the WGTC limited partners if WGTC's returns were negative. The WGTI promissory notes, after describing the indexing process as indicated above,

> provided that, notwithstanding the actual performance of an investment in a limited partnership interest in the Partnership, the Index shall not be less than zero.

(3M Benefits Group's objection to the Receiver's motion for approval of Receiver's Proposed Initial Distribution Plan ("3M Objection to Receiver's Plan"), Exhibit B (emphasis ours).) "In other words, the return [that was] promised to the WGTI Noteholders would reflect any positive returns generated by WGTC, but would not reflect any negative returns" (3M Group brief on appeal at 11), i.e., the WGTI noteholders would not lose their investments even if WGTC lost money.

Although WGTC and WGTI had been created "as two separate limited partnerships and were presented to their investors as two stand-alone entities" (Receiver's 2010 Report at 1),

9

"WGTC and WGTI in reality were financially inseparable" (id.).  The Receiver noted, inter alia, that

- WGTC received funds from WGTI's investors.

- WGTC made payments to or for WGTI's investors.

- WGTC's investors received funds from WGTI.

- WGTC's investors made payments to WGTI.

(Id. at 5.)  Ironically, WGTC and WGTI "had to be operated as a single entity to support the myth that they were stand-alone entities" (id. at 1), because from January 1, 1996, onward, "neither entity could have survived without the financial support of investor funds raised by the other" (id. at 3; see, e.g., id. at 7 ("when WGTC was short of funds, WGTI advanced the funds to WGTC"); Receiver's 2009 Report at 16 ("WGTI paid $200 million to a limited partner of WGTC on July 5, 2005, as the WGTC's balance of funds available for immediate use at July 5, 2005 was only approximately $127 million.")).

The Receiver reported that WGTC and WGTI had

> a long history of . . . com[m]ingling funds, operating with utter disregard for corporate governance, and employing fraudulent accounting practices in an apparent attempt to conceal the true financial condition of the entities from investors, potential investors and, in the case of WGTC, its regulators.

(2009 Report at 2; see also 2010 Report at 8 (charting hundreds of millions of dollars that investors had directed to WGTC that were in fact received by WGTI and were only later sent on to WGTC, and charting hundreds of millions of dollars that WGTI paid to WGTC investors, which WGTC did not repay to WGTI for many weeks).)

While Greenwood and Walsh, over the life of the fraud, consistently reported to investors that their investments had made gains, the investment entities did not have the earnings they reported (see, e.g., Greenwood Plea Allocution Tr. 24) and were in fact undercapitalized as capital accounts were debited for ordinary losses or expenses (see, e.g., 2009 Report at 8-10, 11-17).  For

10

example, when WGTC lost approximately $121 million from its investments in and financing of a company called Signal Apparel Company (of which Greenwood and Walsh were the directors (see id. at 19)), WGTC charged that loss against WGTI's capital account in WGTC (see 2010 Report at 2, 5). When WGTC made employee "advances" to or for Greenwood and Walsh (id.), WGTC also charged those sums to WGTI's capital account, thereby reducing WGTI's investment in WGTC (see id. at 5, 9).

Between January 1, 1996, and October 31, 2003, WGTC advances to Greenwood and Walsh totaled approximately $36 million. (See 2010 Report at 5.) In addition, WGTI, from 2002-2009, paid a company owned by Greenwood's wife an estimated $22 million for the maintenance of the company's 286.2-acre horse farm in Brewster, New York, and its 92 hunter ponies. (See Exhibit Tab 11 to 2010 Report.) In addition, Greenwood and Walsh had a WGTC employee transfer money--ultimately totaling hundreds of millions of dollars--directly from WGTI to the personal bank accounts of Greenwood and Walsh and to third parties to cover their personal expenditures. The personal expenses funded by these transfers included payments to Walsh's ex-wife totaling nearly $20 million (see 2009 Report at 36); more than $10 million for Greenwood's wife's hunter-pony farm (see Exhibit Tab 11 to 2010 Report); and Greenwood's purchase, for more than $3 million, of a collection of 1,348 teddy bears (see 2009 Report at 26).

Greenwood and Walsh eventually signed promissory notes to reflect the moneys transferred from WGTI to their personal bank accounts. (See 2009 Report at 14.) At the time of the Receiver's first report to the district court, the "outstanding notes receivable due from Mr. Greenwood and Mr. Walsh to WGTI totaled" more than a half billion dollars. (Id.)

11

Given the entities' investment losses and the diversion of investment funds to the personal accounts of Greenwood and Walsh, defendants, in order to report to investors that there were gains, used newly invested money to meet other investors' withdrawal requests. "For example, between January 1, 1999 and February 25, 2009, WGTI had income of $70.3 million but paid interest, distributions, operating expenses, and other payments totaling to $381.5 million during that same time period. . . . [T]he cash shortfall during this period was financed by either WGTC's or WGTI's current investors." (Receiver's 2009 Report at 2.) "The shortfall of net earnings allocations to [WGTC and WGTI] investors" totaled "approximately $651 million" as of 2008, and "could not have been paid without raising additional capital from investors." (Receiver's 2010 Report at 19-20.)

When the fraudulent scheme unraveled, defrauded investors asserted claims totaling some $1.5 billion. (See 2009 Report at 2.) By the time of the proposed initial distribution, the claims total--reflecting investors' investments minus their withdrawals--had been reduced to approximately $959 million.

B.  The Receiver's Plan for Initial Distributions

The district court approved a claims administration procedure in which (a) investors and other interested persons would be invited to submit to the court proposals for the distribution of money collected by the Receiver from defendants and their associated entities; (b) the CFTC and the SEC would then be allowed to express their views as to an appropriate distribution plan; and (c) the Receiver would then submit its distribution plan. The Receiver gave investors and other interested persons notice of this procedure. In October 2010, distribution proposals were received from numerous defrauded investors; only two investor proposals are at issue on these appeals.

12

The 3M Benefits Group, comprising the limited partners in WGTC who were not associated with Greenwood and Walsh, proposed that since the 3M Group members' capital accounts, as shown in WGTC records when the Receiver was appointed, totaled some $807 million, it would be fair and reasonable for the Receiver to distribute that sum to the 3M Group (see 3M Group Objection to Receiver's Plan at 23 (describing 3M Group's October 2010 proposal))--leaving only some $8 million for the WGTI investors. Alternatively, the 3M Group argued that the distributions should not be pro rata and that larger shares should be distributed to the 3M Group than to investors in the unregulated WGTI, in order to reward the 3M Group for its prudence in investing in a regulated entity (referred to as the requested "prudence premium") and in order not to encourage those who invested in unregulated entities by compensating them the same as investors who sought safer investments (described as avoiding the "moral hazard" of causing persons who deliberately minimize their risks to subsidize persons who deliberately take risks). (Id. at 23-25.)

KCERA proposed that the Receiver use a "constant dollar" approach, which would distribute larger shares to earlier investors than to more recent investors in order to account for inflation.

In December 2010, the CFTC and the SEC jointly submitted a recommendation to the district court, urging it to adopt--at least for the initial distribution of $815,000,000--"a net investment pro rata distribution plan." (U.S. Commodity Futures Trading Commission's and U.S. Securities and Exchange Commission's Joint Notice of Recommendation for a Distribution Plan ("CFTC/SEC Recommendation" or "Joint Recommendation") at 10.) After quoting some of Greenwood's plea allocution admissions (see CFTC/SEC Recommendation at 16-17), the Joint Recommendation stated that

13

[a] qualitative analysis of the totality of the circumstances shows that Greenwood's and Walsh's fraud had the elements of a Ponzi scheme. Thus, the use of a net investment, pro-rata, distribution plan is "especially appropriate" under such circumstances. See [SEC v. ]Credit Bancorp[, Ltd.], 290 F.3d [80,] 89 [(2d Cir. 2002)] (affirming use of pro rata distribution plan where "earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity.").

. . . .

. . . . A net investment approach looks solely at dollars in and dollars out and makes distribution to the victims based on their net contributions. It also demands a return of funds from those investors who received more funds than they contributed, i.e., Ponzi winners, either by offsets or clawback actions against fully redeemed investors.

(CFTC/SEC Recommendation at 17; see also id. at 17 n.9. (noting that the Receiver had initiated clawback actions against alleged Ponzi winners).)

The CFTC and the SEC stated that their own investigations had confirmed the accuracy of the Receiver's 2009 and 2010 Reports to the court analyzing the evidence as to defendants' fraud. (See CFTC/SEC Recommendation at 6.) Noting that the fraud was "massive [in] scope" (id. at 7) and involved commingling of the accounts and assets of WGTC and WGTI that could not be reliably unraveled (see id. at 17 ("the Defendants' records are unreliable to substantiate customer claims for profits and inadequate to identify the owners of contracts with losses due to the massive fraud, improper commingling, and intentionally deceptive accounting employed by Walsh and Greenwood")), the agencies opposed giving distributional preferences to investors in WGTC over investors in WGTI:

The evidence in the record shows that substantial commingling occurred . . . and that the funds held in the various entities were transferred, dissipated, diverted, and/or misappropriated and then other investor funds were used to cover up the fraud. These commingled investor funds were dispersed without regard for corporate formalities or distinctions. This scheme resulted in clients not having their funds held or invested where Defendants represented

14

they would be held or invested. In fact, the government's and Receiver's investigations uncovered that even as the Defendants represented to a client that his or her particular funds would be deposited in WGTI's account, it was actually deposited in WGTC's accounts and vice-versa. Further, it is clear that transactions were run through WGTI's accounts that were not transactions on behalf of WGTI investors and similarly transactions were run through WGTC's accounts that are not transactions on behalf of WGTC investors. Defendants used both WGTI's accounts and WGTC's accounts as if they were interchangeable. This commingling of funds was part and parcel of the mechanism by which the Ponzi scheme to misappropriate clients' funds worked. This evidence of substantial commingling militates against any claim that the assets of any entity, including WGTC or WGTI, are wholly or substantially intact or that any asset is exclusively an asset of either company.

(CFTC/SEC Recommendation at 8-9 (emphases added).)

The CFTC and the SEC also opposed any suggestion that the Receiver's initial distribution increase long-term investors' shares to account for inflation:

The civil agencies believe net investment--dollar in, dollar out--pro rata distribution plan is the best and most fair approach under the circumstances of this Ponzi-scheme case because it yields a substantial recovery for all investors. Some long-term investors have advocated that rather than employing a net investment model, the Court should instead implement a constant dollar approach--adding an inflation adjuster--when calculating an investor's distribution. Although the use of a constant dollar approach may be appropriate in certain instances, the facts of this matter do not, at the outset, warrant its use here. Currently, the Receiver has marshaled sufficient assets so that under a pro rata distribution method, it will distribute to each investor approximately 89% of their net contributions or investment. The CFTC and SEC believe that these funds should be distributed without an inflation adjustment.

The SEC and CFTC hope, however, that the Receiver will be able to obtain additional funds through the liquidation of various assets owned by the Defendants and Relief Defendants, as well as through several clawback actions the Receiver has filed. In the event that the Receiver acquires funds to distribute in excess of 100% of the net contributions of investors, the Court may wish to consider ordering a hybrid approach where future distributions in excess of 100% of the net contributions be [sic] calculated on a pro rata basis and adjusted to give effect to inflation.

(CFTC/SEC Recommendation at 19-20 (footnote omitted).)

In January 2011, the Receiver submitted its Plan to the district court, moving for approval of an initial pro rata distribution of $815,000,000 to current WGTC and WGTI investors based on each investor's net investment at the time the fraud was discovered (the "Motion"). These distributions were not to include any interest, earnings, or other compensation based on the time value of money. In this initial distribution, each investor would receive approximately 85% of its net investment.

Consistent with the Joint Recommendation submitted earlier, the CFTC and the SEC, which noted their "duty in these civil enforcement actions to proceed in the best interests of the public and the defrauded investors" and "to ensure a fair and equitable return of funds to all investors" (U.S. Commodity Futures Trading Commission's and U.S. Securities and Exchange Commission's Brief in Support of Receiver's Proposed Initial Distribution Plan ("CFTC/SEC Endorsement of Receiver's Plan" or "CFTC/SEC Endorsement") at 3), supported the Receiver's proposal:

> As set forth in the SEC's and CFTC's Joint Notice of Recommendation for a Distribution Plan, the agencies believe that the most fair and equitable method of distribution of the assets held by the Receiver is a net investment pro rata distribution plan.

(Id. at 2 (emphasis added).) Stating that the Receiver's proposed distribution "squarely meets" the agencies' goals of distributions "that will most closely afford complete relief" and would further "the salutary purposes of the Commodity Exchange Act and the Federal securities laws" (id.), the CFTC/SEC Endorsement stated:

> The Receiver's Motion sets forth detailed findings, in pertinent part, that (i) there was significant and extensive commingling of funds between . . . []WGTC[] and . . . []WGTI[], entities under the control of defendants Paul Greenwood and Stephen Walsh and through which the various investors invested funds, and that neither company could have continued to operate without the other; (ii) the investors of WGTC and WGTI were similarly situated with respect to their relationship with Greenwood and Walsh; and (iii) that WGTC and WGTI were operated as a ponzi scheme.

16

(Id.) While reiterating the view that the court might wish to consider having a subsequent distribution make some adjustment for inflation in the event that the total funds recovered by the Receiver reached a level exceeding the defrauded investors' total net contributions (see id. at 3 & n.1), the CFTC/SEC Endorsement concluded that the Receiver's proposal for the initial pro rata distribution without any adjustment for inflation was "[t]he fairest and most reasonable approach" (id. at 3).

C.  The Decision of the District Court

In March 2011, the district court held a hearing at which the Receiver, the SEC and CFTC, and persons interested in the proposed distributions orally presented their views. (See Hearing Transcript, March 16, 2011 ("Hearing Tr.").)  The 3M Benefits Group pursued its contention that persons who invested in regulated entities were entitled to a prudence premium above any pro rata amounts to be distributed to persons who invested in entities that were unaudited and unregulated. (See, e.g., id. at 41-43, 53-54.)  The 3M Group contended that investors in WGTC were not situated similarly to investors in WGTI because WGTC was regulated and WGTI was not; that WGTC had been managed largely as Greenwood and Walsh had promised; that the vast majority of the investor funds pilfered and misappropriated by Greenwood and Walsh had been taken from WGTI; and that when the receivership began, the Receiver found much more money at WGTC than at WGTI.  (See id. at 39, 37.)  The 3M Group argued that "[i]f the WGTI noteholders had not chosen th[e] indirect manner of investing with Walsh and Greenwood, but had insisted on investing in the audited, regulated entity, this fraud could not have occurred in the way it did" (id. at 37-38), and that it was the WGTI investors' "conscious choice . . . to go and put their money at greater risk" that "permitted Walsh and Greenwood to steal their money" (id. at 67).  Despite stating that "of course we were

17

defrauded" (id. at 40), counsel for the 3M Group argued "that the looting here did not occur principally out of WGTC" (id. at 40-41), that "the looting occurred in the unregulated, [un]audited entity" (id. at 116), and that Greenwood and Walsh "didn't really steal our money" (id. at 68 (emphasis added)). Counsel stated that when the Receiver was appointed, WGTC records revealed a total of $807 million in the 3M Group's accounts. (See id. at 56.)

The 3M Group argued that it was only because WGTC was a regulated and audited entity "that there was any money to be distributed" to investors. (Hearing Tr. 37.) The district court, however, pointed out that

> regardless of what the investment vehicle was, . . . . [e]veryone was defrauded. . . . [B]oth [groups of investors] lost money because you were defrauded by the same individual who stole your money, and neither one of you could find out for a decade. . . . Your funds were not segregated in a way that I can examine this record and determine that your funds were untouched and the other people's fungible dollars were stolen.

(Id. at 38-40.) The 3M Group persisted that it would be "unfair and inequitable [where] people . . . took greater risk and consciously chose to avoid and isolate themselves and distanced themselves from the outfit that actually really did legitimate things, . . . to have them share and share alike" with those who sought to avoid risk. (Id. at 67.)

When pressed for specificity as to the amount of its desired premium, the 3M Group suggested that it should receive one-third more than the amount proposed in the Receiver's Plan, both "to vindicate the public policy in favor of regulation and independent auditing" (Hearing Tr. 60) and to avoid the "moral hazard" of "telling the world of investing fiduciaries that it doesn't matter if they explicitly go out of their way to go offshore and put their money in an unregulated entity" (id. at 61). The proposed one-third premium would have given the 3M Group approximately $75 million more in the initial distribution than the $225 million it was to receive under the Receiver's Plan (see id.

18

at 60); the one-third figure was randomly chosen, not tied to any identifiable basis (see id. at 60-61). Alternatively, on the hypothesis that only "28 percent" of the WGTI investors' money "actually ended up being managed in the legitimate side of Walsh and Greenwood's business, WGTC" (id. at 61-62), the 3M Group proposed that only 28% of the funds collected by the Receiver should be distributed to the WGTI investors, with 72% being distributed to the WGTC investors. This alternative would have given the 3M Group some $145 million more than it was to receive under the Receiver's Plan. (See id. at 62.) As its least preferred alternative, the 3M Group proposed that, "[t]o vindicate the importance in the capital markets of regulation and auditing," the 3M Group should be granted a premium of 10% of the total funds recovered by the Receiver, i.e., $81.5 million, "on top of whatever the pro rata would be." (Id. at 68-69.) The 3M Group conceded that the 10% figure was "equally random to the 33 percent increment." (Id. at 69.) Although counsel for the 3M Group stated that "[w]e are not seeking a penny of earnings" (id. at 63), he acknowledged that he did not mean that "the ceiling should be the amount [the 3M Group's members] contributed" (id. at 66).

Also at the hearing, KCERA pressed its contention that the Receiver's initial distribution should use a constant-dollar approach in order to account for inflation, weighting the distribution in favor of those who had longer-term investments than others. KCERA's counsel opposed the prudence premium requested by the 3M Group, stating, inter alia, "we don't as a factual matter know whose money was stolen when, and that is a part of the whole consideration here." (Hearing Tr. 94; see id. at 95 ("As to whose [money] was taken when and how, nobody really knows.").)

However, counsel argued, "[t]hat money was stolen all along. And people who were in this investment at an earlier stage, there was more opportunity to steal their funds . . . ." (Id. at 95.)

19

Reasoning that the real value of a dollar invested long ago is greater than the value of a dollar invested more recently, KCERA argued that the distribution must include "an inflation adjustment" in order not to "treat the long-term investors dissimilarly from the short-term investors because they have been in longer." (Id. at 97.)

Most of the Greenwood and Walsh victims opposed both KCERA's and the 3M Group's distribution proposals. (See, e.g., Hearing Tr. 99, 132.) Counsel for Carnegie Mellon University ("Carnegie Mellon")--an indirect WGTI noteholder--"speak[ing] also on behalf of the other 16 investors" that favored the Receiver's Plan (id. at 99), objected to KCERA's inflation-adjustment proposal on the ground that such an adjustment would, before other victims had recovered their net investments, result in a distribution to KCERA of more money than it had invested (see id. at 105-06). As to the 3M Group's prudence premium proposal, counsel disputed the supposition that the WGTI noteholders had sought to distance themselves from regulation, pointing out, inter alia, that the noteholders had "invested in a fund that was advised by Westridge Capital Management, which is a registered investment adviser under the Investment Advisers Act of 1940 . . . . and is in fact regulated by the Securities and Exchange Commission." (Id. at 100-01.) Carnegie Mellon argued in favor of the Receiver's proposed pro rata distribution on the ground that the WGTI and WGTC assets had been commingled and the fraud victims were similarly situated. (See id. at 103.)

Similarly, counsel for the University of Pittsburgh--a direct WGTI noteholder--argued that

> [t]he investors are, in fact, similarly situated with respect to this fraud, and the distinctions that Mr. Z[ie]gler [counsel for the 3M Group] urges upon the Court, quite frankly, are cosmetic for purposes of this proceeding.

> All of the investors were defrauded in the same way, and Mr. Z[ie]gler's group ignores all of the connections among the Westridge defendants and ignores how they were intertwined and how they operated.

20

> All of the investors, including all of the clients that Mr. Z[ie]gler represents and my client, had investment management agreements with Westridge Capital Management. They were all invested in the same enhanced equity index strategy. They were all sold by the same folks. They were all operated by the same folks. The entities had the same offices and the same personnel.
>
> The[ 3M Group] seem[s] to somehow assume the integrity of the organizational boundaries between Westridge Trading Co. and Westridge Trading Investors. In fact, we know that's not true.
>
> They asked the Court to give weight to the account statements that we know are demonstrably false, and they ignore the unified scheme to defraud that was perpetrated on all of the investors in this room.

(Hearing Tr. 109; see id. at 110, 108-09 (stating that the 3M Group's arguments that only investors who were not members of the 3M Group lost money "are based on investor statements that we know are fictitious, that in the words of the SEC and the CFTC are demonstrably false").)

After hearing all of the arguments, the district court rejected all of the proposals that differed from that of the Receiver. (See Hearing Tr. 130-33.) Referring to "the issues that we've discussed with regard to both the constant dollar adjustment" advocated by KCERA "and the prudence premium issues" advocated by the 3M Benefits Group, the district court stated that neither adjustment would result in "a fairer distribution for either the most victims or a large number of victims." (Id. at 132.)

With regard to the position of the 3M Group, the court found that the record was sufficient "to demonstrate that there was commingling of funds" (id. at 130) and that the investors in WGTC and WGTI

> were similarly situated in relationship to the fraud, in relationship to the losses, in relationship to the fraudsters, and in relationship to the nature of their investments, so that a net pro rata distribution is equitable. It is a fair and reasonable and an equitable way to make this initial distribution to investors.

21

There clearly was a uniform Ponzi scheme here. . . . <u>From the fraudster's point of view, no distinction was made in terms of who would be the victims, where the money would come from</u>. . . . [W]hat defines the scheme[ is] not the nature of the investments, not the nature of the victims, and not the nature of any particular relationship between Westridge or WG Trading that predominates or defines this activity.

(<u>Id</u>. at 130-31 (emphases added); <u>see also</u> <u>id</u>. at 38 ("The money was commingled. . . . There may have been circumstances where it was easier to account for in certain places than other places. But there's nothing about . . . the regulations that oversaw" WGTC "that was particularly beneficial"; it took "a decade to uncover this fraud.").)

Rejecting the KCERA request for an inflation adjustment, the district court indicated that it viewed such an adjustment as skewing the distribution to favor "a more limited number of investors." (Hearing Tr. 131-32.) The court stated that

it may be on the one hand less equitable to those people who had money in the fund earlier [if] they don't get credit for those dollars, adjustment for those dollars. But it is similarly, and therefore balances out, inequitable for those people who . . . are sharing the burden of the entire amount that has been stolen . . . despite the fact that for those people who recently came in they were in the fund at a time when probably the smallest percentage of money was taken if you look at it over the years.

(<u>Id</u>. at 96.)

The district court noted in addition that

[i]t is also important to me that both the SEC and the CFTC and the majority of investors who were trying to see the greatest return on their principal have in the majority backed the receiver's plan of distribution, not because they feel that it is a perfect plan of distribution, but <u>they feel as a choice between this method of distribution and the other methods of distribution that have been suggested that it is the preferable choice for all to maximize the return for the greatest number of investors in a fair and reasonable and equitable manner</u>.

(Hearing Tr. 132 (emphasis added).) The court concluded that the Receiver's proposed pro rata initial distribution "most closely mirrors what would be an equal and equitable distribution of the principal contributions of each of the investors." (Id. at 133.)

As the March 16 hearing drew to a close, the court stated that it would enter an order within a few days, approving the Receiver's Plan and ordering that the initial distributions be made on the 30th day after the date of the order. (See, e.g., id. at 136.) The court stated that it would not grant a stay of the distribution, and that if any interested party wanted a stay it would need to make a motion in the court of appeals. (See id. at 134, 137-40, 143.)

The district court's Order approving the Receiver's Plan and ordering that the initial distributions be made on April 20, 2011, was entered on March 21, 2011. On April 18, the 3M Group filed its notice of appeal and moved in this Court for a "Partial Conditional Stay." The motion was denied.

## II. DISCUSSION

In its appeal, the 3M Group pursues its contention that the district court should have required the Receiver to include in the initial distribution to WGTC investors a prudence premium because they invested in a regulated entity, whereas other investors chose to invest in the allegedly riskier, unregulated entity, WGTI. On the cross-appeal, KCERA pursues its contention that the Receiver's initial distribution should have been calculated in constant dollars in order to account for inflation. For the reasons that follow, we reject both contentions.

23

A district court assessing a receiver's plan for compensation of victims of a fraudulent scheme has "equitable authority . . . to treat all the fraud victims alike (in proportion to their investments) and order a pro rata distribution." SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88 (2d Cir. 2002) ("Credit Bancorp"). "[T]he use of a pro rata distribution has been deemed especially appropriate for fraud victims of a 'Ponzi scheme,'" id. at 89, "where . . . the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders," id. at 88-89.

"Fraud is endlessly resourceful and the unraveling of weaved-up sins may sometimes require the grant of a measure of latitude" to a trustee charged with distributing defrauders' assets to fraud victims. In re Bernard L. Madoff Investment Securities LLC, 654 F.3d 229, 238 n.7 (2d Cir. 2011) ("In re Madoff"). In any event, a trustee or receiver devising a distribution plan is not required to apportion assets in conformity with misrepresentations and arbitrary allocations that were made by the defrauder, "otherwise, the whim of the defrauder would . . . control[] the process that is supposed to unwind the fraud." Id. at 241.

The decision of a district court as to "the choice of distribution plan for [a] receivership estate" is reviewed "for abuse of discretion." Credit Bancorp, 290 F.3d at 87. "A district court has 'abuse[d] its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,' Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 . . . (1990), or rendered a decision that 'cannot be located within the range of permissible decisions,' Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 169 (2d Cir.2001)." Sims v. Blot, 534 F.3d 117, 132 (2d Cir. 2008). In considering whether there has been an abuse of discretion, we review "de novo . . . [the] district court['s] rulings of law," In re Grand Jury Subpoena Issued June 18, 2009, 593 F.3d 155, 157 (2d Cir.

24

2010) (internal quotation marks omitted), and we review factual findings for clear error, see, e.g., Cooter & Gell, 496 U.S. at 401 ("[w]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable").

A. The 3M Group's Appeal

The 3M Benefits Group contends that the district court committed legal error by interpreting the "similarly situated" standard for equitable distributions "as requiring merely that all claimants were defrauded" (3M Group brief on appeal at 29 (emphasis added)), i.e., by ruling that "the only relevant feature of the relationship between investor and defrauder is that the investor was defrauded" (id. at 23). The 3M Group argues that

> the District Court did not even address the [3M Group's] argument that moral hazard would result from allowing investors who purposely chose to isolate their investment from regulation and auditing to recover the identical degree as investors who chose the protections of regulation and auditing. To the extent that the District Court considered the public interest at all, it defined that interest overly narrowly to include solely the equitable concern for maximizing overall return to most investors, to the exclusion of any other public interests or policies. In doing so, the District Court failed to balance all the relevant equitable considerations as is required to reach a fair and reasonable plan.

(Id. at 24-25 (emphases added).) The 3M Group also contends that the court's factual finding that the WGTC investors and the WGTI investors were similarly situated was clearly erroneous. (See id. at 53-59.) None of these contentions has merit.

First, the record does not support the 3M Group's characterization of the district court as adopting a principle that all investors are similarly situated "merely" when all have been defrauded. Rather, the court stated that victims may properly be considered similarly situated for purposes of a pro rata distribution plan when they "were similarly situated in relationship to the fraud, in

relationship to the losses, in relationship to the fraudsters, and in relationship to the nature of their investments," in what "clearly was a uniform Ponzi scheme." (Hearing Tr. 130-31.) This ruling was entirely consistent with the principles enunciated in Credit Bancorp, see 290 F.3d at 88-89.

Second, we see no indication that the district court either ignored the 3M Group's argument that investors in an unregulated entity deserve less compensation than investors in a regulated entity or considered government regulation in general to be irrelevant. In delivering its decision, the court expressly referred to the discussion of the prudence premium issues during the hearing (see Hearing Tr. 132), and as indicated in the colloquy quoted in Part I.C. above, the court expressed the view that the fact that an entity is regulated does not provide assurance that money invested in it will not be stolen (see, e.g., id. at 37-39, 43-44, 66). That view of the regulation to which WGTC was subject as a broker/dealer, relied on by the 3M Group, is supported by the view of the SEC--one of the regulators--that "[b]roker-dealer regulation is designed to protect brokerage customers, not broker-dealers' owners" (SEC brief on appeal at 10; see id. (the 3M Group members' "limited partnership interests in WGTC . . . made them owners of a broker-dealer" and as such they "do not have a superiority of interest based on protection afforded under the securities laws to customers of registered broker-dealers" (emphases in original))). Thus, although the 3M Group characterizes its members as having prudently "chose[n] the protections of regulation" (3M Group brief on appeal at 24), they chose protections that were designed not for their benefit but for the benefit of others. We see no error in the district court's determination that the mere choices of different investment vehicles did not mean that the two groups of defrauded investors in this case were meaningfully dissimilar, given, inter alia, that both the WGTI and WGTC investors "lost money because [they] were defrauded by the same individual who stole [their] money," and no one, whether

they had invested in the regulated or the unregulated entity, "could find out for a decade" (Hearing Tr. 39).

We are not persuaded to reach the contrary conclusion by SEC v. Enterprise Trust Co., 559 F.3d 649 (7th Cir. 2009) ("Enterprise Trust"), on which the 3M Group relies for the proposition that victims of fraud should be awarded different percentages of their losses "'on the basis of the nature of the risk explicitly assumed by the client'" (3M Group brief on appeal at 36 (quoting SEC v. Enterprise Trust Co., No. 08-cv-1260, 2008 WL 4534154, at *2-3 (N.D. Ill. Oct. 7, 2008) (emphasis ours))). The 3M Group's reliance on Enterprise Trust is misplaced for several reasons.

To begin with, the Seventh Circuit in Enterprise Trust did not purport to state overarching legal principles as to circumstances in which a pro rata distribution plan would not be within the proper bounds of discretion. Rather, it simply ruled that the district court in that case had not abused its discretion in approving the layered, non-pro rata, distribution plan presented to it. See 559 F.3d at 652.

Further, the factual circumstances of Enterprise Trust were quite different from those here. The fraud victims in that case included not only investors who had opened "managed accounts" for which Enterprise Trust was supposed to purchase securities, but also "customers [who] used Enterprise only for custodial services (that is, to hold securities that the customers had purchased)." 559 F.3d at 650 (emphases added). Plainly, those two groups were not similarly situated, as the custodial customers did not enter into any agreement that entailed a market or trading risk. Thus, the Seventh Circuit noted that

> [t]he receiver had three principal reasons to give a preference to the custodial investors: first, they did not authorize Enterprise to change or pledge their assets in any way; second, they were in the dark about the fact that Enterprise had used their assets as collateral (while the investors in managed

27

accounts knew, or could have learned from reading the statements Enterprise sent them, that risky investments had been made in their accounts); third, if [Enterprise Trust's principal manager's] strategy had succeeded, the investors in managed accounts (and [the manager] himself) would have reaped [all of] the gains. Because they had been subjected to involuntary and uncompensated risk, the receiver concluded, the custodial investors deserved a larger cut of the remaining pie . . . .

559 F.3d at 652.

None of the Enterprise Trust rationales for a layered distribution is applicable to the present case. As the district court noted here, the members of the 3M Group did not have custodial accounts. (See Hearing Tr. 45.) Rather, they bought limited partnerships in WGTC precisely for the purpose of achieving market gains through WGTC's index arbitrage strategy. The investors in WGTI likewise, though taking the different route of directly or indirectly purchasing senior notes issued by WGTI, sought market gains through the index arbitrage strategy of WGTC. And each group of investors was to profit if the WGTC strategy was successful.

The 3M Group also argues that, apart from the custodial accounts, the Enterprise Trust court approved disparate distributions between investors in the managed accounts. (See 3M Group brief on appeal at 36-37.) However, that disparity was based on the facts that some investors had imposed restrictions on how their accounts were to be managed, whereas others had given Enterprise Trust "carte blanche." 559 F.3d at 652. That difference has no analog here. The record does not indicate that any of WGTC's limited partners--whether WGTI or members of the 3M Group--placed any constraints on WGTC's pursuit of the index arbitrage strategy.

Further, the manner in which defendants operated WGTC and WGTI--consistent with the market-gains goal of both groups of investors--was to show the investors in each group equivalent returns on their respective investments. Thus, the "investment documents" given to WGTI investors

28

stated that "the interest payable" on the promissory notes would be calculated on the hypothesis that their principal had purchased "a limited partner interest of WGTC." (Receiver's 2009 Report at 6.) And in fact thereafter, "the returns o[n] investments in WGTI" and the returns of investments in WGTC "were computed exactly the same." (Id. at 11.)

Thus, we also find inapt the 3M Group's citation of the principle that "'[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite'" (3M Group brief on appeal at 34 (quoting Chemical Bank New York Trust Co. v. Kheel, 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J., concurring) (emphasis ours))). Counsel for the 3M Group, disclaiming any notion that the WGTC investors had contracted for different market risk, stated that its members had sought, by investment in a regulated entity, to avoid the risks of mismanagement and fraud. But the decision to seek gains through investing in a regulated entity was not tantamount to a bargain for different "treatment." Both groups of investors sought the same treatment: receipt of gains from the WGTC index arbitrage strategy.

Moreover, the premise of the 3M Group's moral hazard argument is that the WGTI investors "purposely chose to isolate their investment from regulation" (3M Group brief on appeal at 24; see also id. at 41, 43; Hearing Tr. 67 ("consciously chose to avoid and isolate themselves and distanced themselves from the outfit that actually really did legitimate things" (emphasis added))). The record belies the accuracy of this premise. First, both WGTC and WGTI had been marketed as being under the umbrella of Westridge, which was itself a regulated entity. The WGTI investors, like the WGTC investors, committed 15% of their investments to Westridge. Second, Greenwood and Walsh

> promoted the structure of the Westridge Group with Westridge as a registered investment advisor, regulated by the SEC and with WG Trading as a

29

broker/dealer regulated by the SEC, FINRA, CFTC, NFA, DOL, which was subject to independent annual audits.

(2009 Report at 5 (attaching as Exhibit Tab 2 "Page one from the Westridge Power Point presentation").) The profits sought by the WGTI investors were, explicitly, to be generated by the index arbitrage strategy employed by WGTC, the same regulated entity in which the 3M Group became limited partners seeking profits from WGTC's use of that strategy. And thereafter, every statement of account sent by defendants, "whether or not the investment was a limited partnership interest with WGTC, a direct note placement with WGTI, or an indirect note placement through stock ownership in one of the two BVI companies," bore the following heading: "Scheduled below is an analysis of the changes in your capital account in **WG Trading Company LP**." (2009 Report at 6-7 (bolding in original statement).) Finally, at least one set of investment documents in the record shows that, far from distancing itself from WGTC, a WGTI investor not only received a WGTI promissory note but also entered into a letter agreement with Greenwood, Walsh, Westridge, WGTI, and WGTC containing, inter alia, representations, agreements, and covenants by WGTC and signed by, inter alia, WGTC (see, e.g., Attachment 4 to Declaration of Patricia Gomersall, a CFTC Senior Futures Trading Investigator, dated February 27, 2009). Given all of the above facts, we see no error in the district court's refusal to credit the 3M Group's characterizations of the WGTI investors as attempting to isolate themselves from WGTC.

Nor was the district court required to accept the 3M Group's argument that it should receive a premium on the basis that the Receiver found much more money at WGTC than at WGTI (see, e.g., Hearing Tr. 37). The Receiver observed that WGTC and WGTI had "a long history" (2009 Report at 2; see also Greenwood Plea Allocution Tr. 24-27) of not only commingling funds, but also "employing fraudulent accounting practices in an apparent attempt to conceal the true financial

30

condition of the entities from," among others, their investors (2009 Report at 2). Thus, WGTC received money from WGTI's investors; WGTI received money from WGTC's investors; WGTC made payments to or for WGTI's investors; WGTI made payments to WGTC's investors. (See Receiver's 2010 Report at 5 & Exhibit Tabs 1, 1A.) At the behest of WGTI, WGTC made employee advances to Greenwood and Walsh and charged WGTI's capital account. When WGTC lost $121 million by financing and investing in Signal Apparel Company, WGTC charged those losses against the capital account of WGTI. (See 2010 Report at 2, 5.) And "when WGTC was short of funds, WGTI advanced the funds to WGTC" (id. at 7); "neither entity could have survived without the financial support of investor funds raised by the other" (id. at 3). "WGTC allocated actual yearly earnings to its limited partners based on an arbitrary earnings rate and then allocated the remaining income or loss to WGTI." (2009 Report at 2 (emphasis added).) Given the long history of commingling, defendants' operation of WGTC and WGTI as if they were a single entity, and defendants' employment of fraudulent accounting practices, the record supported the view of the CFTC and the SEC that the assets of WGTC and WGTI could not be reliably unraveled. Acceptance of the 3M Group's argument that the court should grant its requested premium on the theory that the financial records found by the Receiver were accurate would, in the words of In re Madoff, let "the whim of the defrauder . . . control[] the process that is supposed to unwind the fraud," 654 F.3d at 241.

Lastly, we note that although the 3M Group characterized market risk as "inevitabl[e]" (Hearing Tr. 44), the record suggests that prospective investors chose the WGTI senior-promissory-note route as a means of limiting the risk of market loss, given that the terms of those notes stated that "the return promised to the WGTI Noteholders would reflect any positive returns generated by WGTC, but would not reflect any negative returns" (3M Group brief on appeal at 11). That provision

31

in the notes did indeed create a difference between the WGTI noteholders and the limited partners in WGTC who had no such protection against losses. But, as the SEC points out, "it is difficult to see why such a provision would be reason to give preferential treatment to the WGTC claimants rather than the notes company claimants" (SEC brief on appeal at 12 n.4 (emphasis in original)).

In sum, the record demonstrates that the WGTC and the WGTI investors had the same goal of profiting from WGTC's index arbitrage strategy; that both groups of investors were solicited as investors by the same defendants; that both groups had agreements with Westridge and with WGTC; that both groups were treated economically the same in defendants' arbitrary account statements; that the assets of WGTC and WGTI were commingled and were run as a massive Ponzi scheme for more than a decade; that the 3M Group as well as the investors in WGTI were defrauded; and that the commingled assets could not be unraveled reliably. We conclude that the district court neither made an error of law nor made erroneous factual findings in determining that, in the material respects, the investors in WGTC and WGTI were similarly situated.

Finally, we see no basis for any suggestion that the district court's approval of the Receiver's pro rata distribution plan was beyond the range of permissible decisions. As the investors in both entities were permissibly found to be similarly situated, it was well within the district court's equitable authority to reject the 3M Group's requested premium distributions. Under the Receiver's pro rata distribution plan, each member of the 3M Group, like each WGTI investor, was to receive approximately 85% of the net amount it had invested. Giving the 3M Group any of the premiums it requested would have meant that the distributions to the other fraud victims would be reduced to 64-76% of their net investments, while the 3M Group members would receive more money than they had invested--their largest requested premium presenting them with a profit of nearly 40%. It was

32

well within the district court's discretion to conclude that, as a matter of equity, some of the similarly situated victims should not profit at the expense of the other victims.

B. The KCERA Cross-Appeal

KCERA, while observing, in opposition to the appeal by the 3M Group, that the district court has broad discretion to adopt any distribution that is fair and reasonable (see KCERA brief on appeal at 13), and that the district court correctly held that the funds in this case should be distributed pro rata, given that the funds were commingled and the investors were similarly situated (see, e.g., id. at 14-16), pursues on its cross-appeal the contention that the pro rata distributions should have been adjusted for inflation to compensate long-term investors such as KCERA (see id. at 25). We see no abuse of discretion in the district court's approval of the Receiver's Plan without requiring the requested inflation adjustment.

KCERA has not cited any authority that supports the proposition that an inflation adjustment is required as a matter of law when there is to be a distribution of assets to a group of similarly situated victims and those assets are insufficient to make all of the victims whole. Although KCERA argues that "the Supreme Court has made clear [that] to satisfy the goal of treating 'similarly situated creditors similarly' by applying sound 'objective economic analysis,' creditors should receive compensation for 'the time value of their money,'" (KCERA brief on appeal at 27 (quoting Till v. SCS Credit Corp., 541 U.S. 465, 477 (2004) (emphasis in brief))), Till involved a bankruptcy case and a statutory provision, 11 U.S.C. § 1325(a)(5), "[t]he text of [which wa]s consistent with the view that the appropriate discount rate [for use in a bankruptcy cramdown proceeding] should reflect . . . the time value of money," 541 U.S. at 483 n.25 (internal quotation marks omitted). There is no such statutory provision governing enforcement actions such as those at issue here.

33

Nor are the other cases cited by KCERA as requiring calculations to account for the time value of money applicable here. They involved such issues as the adequacy of a state tax refund or, in private civil actions, the proper calculation of the amount of damages needed to make the claimant whole. None of them involved governmental enforcement actions in which there are numerous victims and insufficient assets to provide complete compensation.

KCERA's argument that "the SEC repeatedly urg[ed] an inflation adjustment in the Madoff litigation" (KCERA brief on appeal at 25) is beside the point. The inflation issue was not ruled on in the bankruptcy court in that litigation, see In re Madoff, 654 F.3d at 234, and this Court expressly declined to opine as to whether such an adjustment should be made, see id. at 235 n.6.

Finally, we note that the distribution at issue on these appeals is the "Receiver's Proposed Initial Distribution Plan" (emphasis added). As the CFTC and the SEC stated in the district court, it is possible that the Receiver will recover additional funds in, for example, its pending clawback actions against investors who had withdrawn their entire investments prior to the commencement of these enforcement actions (see, e.g., CFTC/SEC Recommendation at 17 n.9)--some of whom were likely paid using newly invested funds that defendants received from other investors. The agencies have taken the position that, although there should be no adjustment for inflation at this stage since the funds that the Receiver had collected were insufficient to make all of the victims whole, an inflation adjustment may become appropriate if the clawback actions result in the Receiver's collecting more than 100% of the net amounts invested by the victims. (See id. at 19-20; CFTC/SEC Endorsement of Receiver's Plan at 3 & n.1.)

In the event that the Receiver does recover sufficient funds to provide all of the fraud victims with more than their respective net investments, the district court will be free to consider whether to approve an inflation adjustment if the Receiver proposes one, or to consider whether to

require such an adjustment if it is not proposed.  In the present circumstances, we see no abuse of discretion in the district court's refusal to require such an adjustment in the initial distribution.

CONCLUSION

We have considered all of the contentions of the 3M Group and KCERA in support of their respective appeals and have found them to be without merit.  The March 21, 2011 Order of the district court is affirmed.